**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| NEIL EICHMAN, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MEGAN R. EICHMAN | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| AUSTIN RISSANEN, in his individual capacity; CHARLESTON COUNTY SHERIFF'S OFFICE; and TOWN OF JAMES ISLAND, | ) ) ) ) ) |
| Defendants. | ) ) |

Civil Action No.: 2:20-04057-BHH

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT RISSANEN'S RENEWED MOTION FOR SUMMARY JUDGMENT**

Plaintiff Neil Eichman, as Personal Representative of the Estate of Megan R. Eichman, respectfully submits his Response in Opposition to the renewed motion for summary judgment filed by Defendant Austin Rissanen, (ECF No. 83). For the reasons set forth below, Defendant Rissanen's motion should be denied and the claims against him should proceed to trial.

## INTRODUCTION

Megan Eichman was killed on the evening of November 18, 2018, when an unmarked Charleston County Sheriff's Office SUV driven by Defendant Austin Rissanen was speeding down Folly Road at 103 miles per hour and crashed into her car as she was making a left turn into a parking lot. The collision occurred just one-quarter of a mile from the intersection of Folly Road and Camp Road on an evening when many families were leaving the Charleston Holiday Festival of Lights. Had Defendant Rissanen not struck Megan's vehicle, he undoubtedly would have barreled through the intersection and killed someone else.

Although Defendant Rissanen was employed as a deputy sheriff with the Charleston County Sheriff's Office ("CCSO"), he was not on-duty at the time he struck and killed Ms. Eichman and was not dispatched to respond to any emergency.  Rather, he was working an off-duty assignment for the Town of James Island and decided to travel to another deputy's location without informing anyone in his chain of command that he was leaving his post.  And although Rissanen claims he was driving with his blue emergency lights and siren operating at the time of the collision, there is a substantial dispute of this in the record—including eyewitnesses who saw Rissanen immediately prior to the collision without any emergency lights and/or siren operating—which presents a genuine dispute of fact that the jury will have to resolve at trial.

Against this backdrop, Defendant Rissanen argues that his conduct was at worst grossly negligent and, therefore, he should be dismissed as a defendant in this case. In support of his motion, Defendant Rissanen offers a patchwork of disparate and outdated legal arguments and citations to irrelevant and abrogated case law from various courts outside of the Fourth Circuit to argue that his reckless driving at speeds *60 miles per hour over the posted speed limit* at night, on a dark and wet roadway with over a dozen other cars passing by does not and could not amount to deliberate indifference under the law.  He does this all the while ignoring binding precedent from the Fourth Circuit that completely eviscerates his summary judgement arguments: *Dean v. McKinney*, 976 F.3d 407 (4th Cir. 2020).

## RELEVANT FACTUAL BACKGROUND

The following evidence demonstrates a genuine issue of material fact on the issue of Rissanen's conduct and liability under § 1983 and state negligence law.  Set forth below is a brief overview of the case followed by a concise statement of material facts in dispute.

### I.     Material Facts Not in Dispute

The November 18, 2018 collision that killed Ms. Eichman occurred at approximately 9:50 p.m. in the 1000 block of Folly Road in James Island.  (Ex. 1, MAIT report at 1.)  Ms. Eichman was driving southbound on Folly Road, slowed and entered the middle turn lane to make a left turn into a parking lot.  Vehicle data recorded from Rissanen's SUV establishes that his speed in the seconds immediately prior to the collision was 103 miles per hour, which Rissanen does not dispute.  (Ex. 1, MAIT report at 12; *see also* Ex. 2, Poplin Report at 5, 30 (vehicle data report); Ex. 3, Rissanen Tr. 264:11-21.)  The speed limit on the section of Folly Road where the collision occurred is 40 miles per hour.  (Ex. 2, Poplin report at 5.)   The collision occurred at night and the roadway was wet.  (*Id.* at 6.)

Defendant Rissanen was at the time and remains employed by CCSO as a deputy sheriff. He was driving an unmarked 2016 Chevy Tahoe sport utility vehicle owned by CCSO, yet he was not on-duty at the time of the collision, rather he was working an off-duty shift for the Town of James Island.  Rissanen's unmarked Tahoe was not equipped with a dashboard camera recording system, had no external rooftop emergency lights, and lacked any other external markings indicating it was a law enforcement vehicle.  (Ex. 3, Rissanen Tr. 261:1-11.)  Rissanen was accompanied in his vehicle by a volunteer state constable, William Kitchener, who was participating in a ride-a-long.

Rissanen and Kitchener were at a Blue Water gas station located at 1311 Folly Road (approximately one mile south of the collision site) where he said he found an unattended vehicle with loud music playing.  According to Rissanen, he then activated his body worn camera.  At some point later, while at the gas station, Rissanen claims he heard Deputy Carter yell his call sign over the radio.  Deputy Carter was conducting a traffic stop two and a half miles away on Ellis Oak Road and Folly Road outside of the Town of James Island limits and the driver, who had a

suspended license, later fled on foot. The police dispatcher attempted to contact Deputy Carter on the radio and when he did not respond, the dispatcher asked other units near Deputy Carter to respond to his location. Two on-duty deputies nearest to Deputy Carter announced on the radio that they were en route to his location. (Ex. 4, Rissanen Stmt. CCSO RRFP 31-33.)

According to the Charleston County Computer Aided Dispatch "CAD" report, Deputy Carter informed dispatch of his traffic stop at Folly Road and Ellis Oak Road at 9:41:11. (*See* Ex 5, CAD report for Deputy Carter's traffic stop.) The report and corresponding audio (Ex. 6) establish that at 9:43:07 Deputy Carter advised that he pulled into the Post Office, which is located at the intersection of Folly Road and Central Park Road. Deputy Carter radioed his unit number (Unit 224) to dispatch. (*Id.*) After not raising him on the radio, dispatch then put out a channel marker tone on the radio to limit its use to emergency calls only. (*Id.*) According to Assistant Sheriff Mitch Lucas, who was the second-in-command of Sheriff's office, the marker tone simply indicates to deputies that radio transmissions should not include anything unrelated to the call, such as taking a meal break. (Ex. 7, Lucas Tr. 80:11-81:11.) Dispatch asked over the radio if there are available units to respond to Deputy Carter's location at the Post Office. (Ex. 5, CAD report for Deputy Carter's traffic stop and Ex. 6, CAD audio.) At 9:46:22, Unit 224 (Deputy Brian McCoy), who informed dispatch that he was also on Central Park Road, told dispatch that he was responding. (*Id.*) At 9:46:40, Unit 248 (Deputy Mary Auer) also advised dispatch that she is "going down Central Park [Road] right now," and the CAD report indicates that Deputy Auer was also "dispatched." (*Id.*)

The CCSO's Communications policy states that one of the "duties" and "primary responsibilities" of the Charleston County Consolidated 911 Center is "dispatching, coordinating, and monitoring radio communications for deputy sheriffs and other law enforcement, emergency,

and public safety personnel." (*See* Ex. 8, Communications policy at 2.) Rissanen, who was off-duty, was not dispatched to respond to Deputy Carter's location. Despite being off-duty Rissanen, decided on his own to travel two and half miles to Deputy Carter's location at the Post Office. Rissanen did not inform his dispatcher, his supervisor, or anyone else that he was responding to Deputy Carter's location as he was required to do. (*See* Ex. 3, Rissanen Tr. 155:3-18; *see also* Ex. 8, Communications policy at 12 ("Deputy sheriffs will advise the 911 Center . . . when acknowledging a call.), *id.* at 13 ("Deputy sheriff's will acknowledge receipt of the call; advice when they are enroute and method of response, such as Code 1, 2, or 3.").)

Rissanen claims he was operating his emergency lights and sirens while driving, but in addition to not informing dispatch that he was responding to Carter's location, he did not report his purported use of emergency lights and sirens on the radio to dispatch as he was required to do under CCSO's policies and procedures governing radio communications and emergency driving. (*See* Ex.8, Communications Policy; Ex. 9, Vehicle Operations Policy.) Further, Rissanen deliberately switched off his bodycam as he was speeding along Folly Road. (*See* Ex. 3, Rissanen Tr. 265:4-8 (Q: And your body cam had been turned on at the Blue Water gas station, but then you switched it off while you were driving down Folly Road; is that correct? A: Yes.).)

As Rissanen continued down Folly Road, he saw Ms. Eichman's vehicle, but admitted that he could not tell if it was moving or stationary. (*Id.* Tr. 266:15 – 267:15 ("To me it appeared like she was stopped, but it may have been because from my vantage point she was just very, very slowly moving down the median.").) Rissanen believed that the speed limit on the stretch of Folly Road he was traveling on was 40 or 45 miles per hour. (*Id.* Tr. 273:25 – 274:2.) The actual speed limit on this portion of Folly Road is 40 miles per hour. (Ex. 2, Poplin Report at 6.)

Ms. Eichman began her left turn into the parking lot when she was hit by Rissanen's Chevy Tahoe.  (*Id.* at 6.)  The collision occurred at approximately 9:48 p.m., which is more than one and half minutes after the on-duty deputies were dispatched to Deputy Carter's location.  (*Id.* at 1.)  The South Carolina Highway Patrol's Multi-Disciplinary Accident Investigation Team ("MAIT") reviewed data recorded from Rissanen's airbag control module (i.e., vehicle black box data) and concluded that Rissanen was driving 103 miles per hour in the seconds before impact.  (*Id.* at 8.)  Ms. Eichman died at the scene.

CCSO has several policies and procedures that govern deputies' performance of their law enforcement duties.  The Vehicle Operations Policy and Procedure 1-08 (*see* Ex. 9) explains the expected response to calls for service. Section III.G.3 of the policy states that "Radio contact must be maintained while operating the vehicle.  Deputy sheriffs will advise the CDC [consolidated dispatch center] when in proximity of an emergency call."  (*Id.* at 2.)  Section V of the policy provides the procedure for responding to calls for service.  (*Id.* at 8.)  Bullet point 2 explains that the dispatcher will select the unit(s) within the service area closest to the call for service. (*Id.*) Bullet point 4 explains that when responding units change their response code [i.e. from Code 1 to Code 3] they are to immediately notify CDC and the patrol supervisor.  (*Id.*)  Units responding Code 3 (i.e., with emergency lights and sirens activated) must respond "with paramount consideration for the safety of the public and the deputy sheriff."  (*Id.* at 9.)  The policy requires deputies to balance the risk of their response against factors such as road conditions, vehicle traffic, and the distance to be traveled.  (*Id.* at 9-10.)

Although Deputy Rissanen was not involved in a vehicle pursuit, several of the standards set forth in the Sheriff's Office's Vehicle Pursuit Policy and Procedure regarding emergency driving are equally applicable to emergency vehicle operations.  (Ex. 10, Alpert report at 5.)

Vehicle Pursuit procedure 6-12 IV.B.1. states that "All emergency vehicle operations will be conducted in strict conformance with applicable state statutes." (*See* Ex. 11 at 3.) Section IV.B.2 provides that the "use of emergency lights and siren does not relieve a deputy sheriff from the responsibility of driving defensively and with due regard for the safety of other drivers, bicyclists, and pedestrians. When using emergency equipment, the deputy sheriff is requesting the right of way and does not have absolute right of way to indiscriminately disregard traffic lights or stop signs." (*Id.* at 3-4.) Section IV.B.6 provides that "deputy sheriffs will not drive with reckless disregard for the safety of others." (*Id.* at 5.) The policy also includes a requirement that a deputy inform dispatch of the emergency driving and limits the number of vehicles involved in the vehicle pursuit emergency response to two units for safety reasons. (*Id.*)

The Sheriff's Office's Communications Procedure 4-09 discusses radio use requirements during emergency responses. (*See* Ex. 8.) Section III.A.3 provides that the duties of the dispatch center include "dispatching, coordinating, and monitoring radio communications for deputy sheriffs and other law enforcement, emergency and public safety personnel." (*Id.* at 2.) Section III.J outlines procedures for radio communications between deputies and dispatch, including a requirement in III.J.6 that "Deputy sheriffs will advise the 911 center . . . when acknowledging a call," a requirement in III.J.8 that "Deputy sheriffs will acknowledge receipt of the call; advise when they are enroute and method of response, such as Code 1, 2, or 3." (*Id.* at 12-13.) Section III.K of the policy outlines the "Criteria to Determine the Number of Sworn Personnel Dispatched" to a response, with the standard response being a single unit and setting forth circumstances where two or more responding units may be required. (*Id.* at 15.)

Following the collision and death of Ms. Eichman, the South Carolina Highway Patrol MAIT team investigated the collision and concluded that had Rissanen been driving the posted

speed limit, "the collision would not have occurred." (Ex. 1, MAIT Report at 11.) CCSO conducted its own internal investigation and concluded that, in its view, Rissanen had done nothing wrong, but issued him a Letter of Instruction for not wearing his seat belt. (Ex. 12, Letter of Instruction.) Rissanen's punishment for driving 100 miles per hour along Folly Road and killing a young woman was to write a "research report on seat belt safety" that would be no more than two pages in length discussing the importance of seat belt use. (*Id.*) Rissanen testified that he completed the paper, but could not recall where we wrote it, how long it was, or what the Sheriff's Office did with it. (Ex. 3, Rissanen Tr. 385:6 – 386:24.) When asked to produce a copy of Rissanen's "research report" in discovery, CCSO said it was unable to locate it (despite its years-long legal obligation to preserve all relevant evidence in this case). (Ex. 13, CCSO's Response to Plaintiff's Fourth Set of Requests for Production, No. 2.) The Letter of Instruction also required Rissanen to use an agency vehicle equipped with a dash camera on all future off-duty assignments, but this requirement was later rescinded. (Ex. 3, Rissanen Tr. 387:10 – 388:20.)

The November 18, 2018 collision with Ms. Eichman was not Defendant Rissanen's first vehicle collision during an emergency response. He previously lost control of his police vehicle while responding to a scene with emergency lights and sirens activated. (Ex. 14, July 10, 2013 traffic collision report.)

**I.**    <u>**Expert Findings and Opinions**</u>

Plaintiff's four experts have offered opinions in this case on issues of emergency driving, accident reconstruction, human factors, and law enforcement training, policies, and practices:

     A.    <u>Accident Reconstruction Expert Woodrow Poplin</u>

Plaintiff's accident reconstruction expert Woodrow Poplin examined the collision scene multiple times, examined both vehicles, examined the report and notes from the South Carolina

Highway Patrol's MAIT team investigation, including the electronic data recorded recovered from Rissanen's Chevy Tahoe and surveillance video of the collision, and has offered the following findings and opinions (*see* Ex. 2 (Poplin Report); *see also* Ex. 15, Poplin Tr. 27:22 - 28:14; 43:19 - 44:7; 70:13 - 71:07; 72:23 - 73:06; 89:11 - 92:16; 101:02-19; 106:07 - 107:3; 107:24 - 109:04; 112:11-20; 116:13 - 117:14.):

- Rissanen's Chevy Tahoe was travelling at 103 miles per hour as he approached the collision area. (Ex. 2, Poplin report at 8, 9.)

- From Rissanen's prior stop at the Bluewater gas station to the site of the collision he traveled approximately one mile. (*Id.* at 8.)

- In the 97 seconds immediately preceding the collision, nine southbound vehicles and eight northbound vehicles pass by the collision area, including a northbound vehicle ahead of Rissanen's Chevy Tahoe that passed the area approximately 2.8 seconds prior to the collision. (*Id.*)

- In the area of the collision, traffic is potentially actively entering and exiting the Folly Road travel lanes to the left, to the right, and to the center. (*Id.*)

- As Rissanen travelled northbound on Folly Road, he passed through two signalized intersections, seven stop controlled intersections, and 51 driveways. (*Id.*); (*see also* Ex. 16 (daytime video taken by Poplin of Rissanen's route from the Blue Water gas station to the site of the collision.)

- Any intervening traffic on the road could be a potential visual obstruction for one driver and not another. (Ex. 2, Poplin Report at 8, 9.)

- It cannot be concluded that Ms. Eichman had an unobstructed view and observed police lighting of Rissanen's Chevy Tahoe prior to initiating her turn into the parking lot. (*Id.* at 8, 9.)

- Even if Ms. Eichman observed police lighting on Rissanen's vehicle, the shallow approach angle between the vehicles would make it difficult to assess the actual speed of the Rissanen's approaching SUV. (*Id.* at 8, 10.)

- Ms. Eichman's vehicle was moving at approximately 25 mph at the time she was hit by Rissanen. (*Id.* at 9.)

- A decision by Ms. Eichman to vacate the roadway in the intended direction of travel is not considered an unreasonable response by a driver.  (*Id.* at 8, 10.)

- Few drivers would have significant experience in recognizing or assessing the time frame available to turn in the presence of traffic approaching at 103 miles per hour.  (*Id.* at 8, 10.)

- Rissanen's vehicle slowed approximately 10 miles per hour / per second in the 2.2 seconds preceding the collision (from approximately 103 mph to 80 mph).  (*Id.* at 7.)

- Rissanen's was travelling at approximately 80 miles per hour at the moment he collided with Ms. Eichman's Nissan Altima.  (*Id.* at 6, 9.)

- An emergency vehicle's lights and siren's primary purpose should be to alert pedestrians and other drivers in sufficient time to allow them to vacate the path in front of the patrol vehicle.  (*Id.* at 8, 10.)

- The emergency lights and siren do nothing to alter the limitations of physics nor do they enhance the design of the roadway or the design of the vehicle.  (*Id.* at 8-9, 10.)

- From a traffic safety perspective, it can only be concluded that travel at night in a moderately congested urban area, on a wet roadway at more than 2½ times the posted speed limit is unreasonably dangerous to all those involved and those encountered along the way.  (*Id.* at 9, 10.)

B.    Law Enforcement Emergency Vehicle Operations Expert Geoffrey Alpert, Ph.D.

Plaintiff's emergency driving expert Dr. Geoffrey Alpert examined the facts of Rissanen's driving, his and other witness testimony, the Charleston County Consolidated Dispatch CAD report, the internal investigation report of the collision, and relevant policies promulgated by CCSO and has offered the following findings and opinions (*see* Ex. 10 (Alpert Report); Ex. 17, Alpert Tr.  9:08-10:25; 31:19-33:22; 37:22-44:03; 44:17-54:12; 63:18-64:18; 67:14-79:22; 83:14-86:14; 103:19-104:10; 107:07-113:25.)

- There was no information or evidence that Deputy Carter was in trouble or in need of assistance other than his loud voice on the radio.  (Ex. 10, Alpert report at 6.)

- Rissanen was neither dispatched to respond to Deputy Carter, nor did Rissanen inform dispatch that he was responding to the location and doing so in a Code 3 status, which violated his own agency's policies and violated common police practices for emergency vehicle operations and law enforcement communications. (*Id.* at 6.)

- Rissanen was not told to respond to or dispatched to Deputy Carter's location but took it upon himself to go there without informing dispatch or any supervisor, without knowing what the call was about and without listening to the radio to determine if other deputies were closer and responding to Carter's location.  (*Id.*)

- Deputy Rissanen observed the vehicle Ms. Eichman was driving as he approached her location on Folly Road but he could not determine whether she was stopped or moving slowly down the median.  (*Id.* at 3, 6.)

- Ms. Eichman and all others on the roadway have the expectation that approaching vehicles are traveling at reasonable speeds and that emergency vehicles are not operating in a reckless manner.  (*Id.* at 7.)

- While emergency vehicles are authorized to violate some rules of the road in emergency circumstances when they drive with due regard for the safety of the public with emergency lights and siren activated, Deputy Rissanen was driving more than twice the speed limit at speeds exceeding 100mph which was neither reasonable nor driving with due regard for the safety of others.  (*Id.* at 6.)

- Emergency vehicles are not authorized to drive at speeds that put the public at great risk of death or serious bodily injury.  (*Id.*)

- Deputy Rissanen was not driving in a reasonable or safe manner, was not driving with due regard for others and created an unreasonable risk to the public.  (*Id.* at 7.)

- Rissanen's high speed driving (over 100mph on Folly Road) was unreasonable, reckless, violated his own agency's vehicle operations policies and violated national standards for emergency vehicle operations and South Carolina law. (*Id.*)

- Rissanen testified that he expects other drivers to yield the right of way to him when he is running emergency lights and sirens, which is contrary to his duty and responsibility "of driving defensively and with due regard for the safety of others." (*Id.*)

- Rissanen's high speed and reckless driving was a proximate cause of the collision with Ms. Eichman and the collision was a proximate cause of her death.  (*Id.*)

C.    <u>Human Factors Expert Kevin Rider, Ph.D.</u>

Plaintiff's human factors expert, Dr. Kevin Rider, examined the facts of Rissanen's and Eichman's driving, examined the collision scene at night, reviewed Rissanen's and other witnesses' deposition testimony and Poplin's accident reconstruction data and has offered the following findings and opinions (*see* Ex. 18 (Rider Report); *see also* Ex. 19, Rider Tr.  7:10-28:21; 47:08-49:13; 51:9-18; 62:8-67:16; 70:14-71:02; 104:17-105:22.):

- The perceived distance of a vehicle is the primary means by which a nighttime driver can determine whether it is safe to make a left turn across travel lanes.  (Ex. 18, Rider report at 7.)

- Driver research shows that it is difficult for drivers to accurately assess the speeds of vehicles that are traveling directly to or away from them."  (*Id.* at 7.)

- Drivers tend to expect that other vehicles are traveling at or near the speed limit, and their ability to discern the speed of oncoming vehicles is primarily dependent on how fast the oncoming vehicle appears to be growing in their field of view.  This "perceptual looming effect" limits a driver's ability to recognize that an oncoming vehicle is speed.  (*Id.* at 7.)

- Rissanen admitted that it is difficult for a normal person to predict how fast approaching vehicles are traveling unless they had advanced training like he does.  (*Id.* at 7.)

- Driver research demonstrates that discerning the actual speed of an approaching vehicle is limited to about 5 seconds prior to arrival.  (*Id.* at 9.)

- Prior to initiating their turn across traffic, drivers determine when there is adequate time to safely complete the maneuver, referred to as "gap acceptance," and this determination is principally based on the visual clues available to the driver, such as the perceived distance of the oncoming vehicle.  (*Id.* at 8.)

- Rissanen would have been at least 392 feet from impact when he detected Ms. Eichman's turning movement.  From a distance of 392 feet, had Rissanen been travelling at the speed limit of 40mph (58.7 feet per second), it would have taken him 6.7 seconds to reach the collision point.  (*Id.* at 7.)

- Had Rissanen been traveling 100mph with a 6.7 second acceptance gap, he would have been approximately 982 feet away from Ms. Eichman—more than 3 football fields—a distance at which nearly all drivers would decide to initiate the left-hand turn.  (*Id.* at 9, 13.)

- Based on the distance of Rissanen's vehicle prior Ms. Eichman's turn, it would have been difficult for a southbound driver such as Ms. Eichman to accurately assess his speed. (*Id.* at 7.)

- Rissanen implies that it is safer to drive at higher speeds at night, yet the primary visual cues available to drivers during the daytime are typically not available during nighttime driving. At night, the primary visual cue available is the oncoming vehicle's headlights. (*Id.* at 12.)

- Rissanen's testimony that it is easier to determine vehicle speeds at night is in direct contrast to driver research. (*Id.* at 12.)

- Despite Rissanen's characterization of the area of the collision, there are few streetlights along Folly Road, which provide little illumination to the roadway. Illumination from nearby commercial signs provide intermittent lighting in the area of the signs, but roadway information is primarily provided by vehicle headlights. (*Id.* at 12.)

- At night, vehicle headlights provide some indication of vehicle distance and little to no useful information regarding the oncoming vehicle's speed. (*Id.* at 7.)

- Rissanen's decision to travel Folly Road at 2.5 times faster than the posted speed limit created a dangerous condition that contributed to the collision. (*Id.* at 13.)

- Had Rissanen been traveling at the posted speed limit, Ms. Eichman would have had enough time to safely navigate her turn, and this crash would not have occurred. (*Id.* at 13.)

D.  <u>Law Enforcement Expert Chief Roy G. Taylor, Ph.D.</u>

Plaintiff's law enforcement training, policies and practices expert, Dr. Roy Taylor, is a law enforcement professional with over 40 years of experience. He compared the facts of the case against similar instances of reckless and/or speeding driving by Charleston County Sheriff's Deputies that resulted in serious physical injuries or death both before and after Defendant Rissanen's killing of Megan Eichman. Chief Taylor has offered the following findings and opinions (*see* Ex. 20, Taylor Report, *see also* Ex. 21, Taylor Tr. 33:23-36:13; 51:24-59:02; 62:4-22; 66:17-67:24; 70:15-77:25; 79:16-89:04; 98:3-99:5; 102:23-105:17; 110:10-112:23; 115:11-

13

116:19;  117:04-118:21;  119:4-120:21;  129:15-131:21;  169:05-13;  176:9-23;  182:18-183:11;

186:18-193:07; 195:21-198:14; 200:8-202:13.):

- Charleston County Sheriff's deputies have repeatedly caused serious injury and/or death to motorists driving on local roads through high-speed and reckless driving incidents and/or failure to yield to other motorists in the years prior to as well as after the death of Megan Eichman.  (Ex. 20, Taylor report at 5.)

- CCSO was involved in 78 traffic collisions in 2019 in which it admitted fault in over half.  Four of the incidents in which the agency admitted fault involved deputies operating their emergency lights and siren.  (*Id.* at 6.)

- At an undetermined point in 2020, CCSO was involved in 23 collisions in which they admitted fault in at least seven of the crashes.  (*Id.* at 6.)

- Since 2014 speed has been a factor in 13 deputy involved crashes, eight of which involved serious or life threatening injuries.  (*Id.* at 6.)

- CCSO is aware that drivers travelling 60 mph or more are twice as likely to be involved in a fatal crash as a driver traveling 45 mph and that drivers traveling at 70 mph or more are four times more likely to be involved in a fatal crash than a driver travelling 45 mph.  (*Id.* at 6.)

- CCSO data shows that it was aware its deputies continued to engage in reckless and/or high speed driving causing other motorists to be at risk.  Despite this ongoing pattern of reckless and dangerous driving by deputies operating police vehicles and causing serious injury or death to civilian motorists, CCSO took virtually no action to deter such conduct.  (*Id.* at 6.)

- CCSO and the Town of James Island did not act consistently with professional law enforcement standards by failing to discipline, train, and properly supervise deputies.  (*Id.* at 7.)

- The sheer absence of any meaningful response by CCSO to serious traffic collisions caused by deputies or to enforce its written policies, both before and after the collision that killed Megan Eichman, demonstrates indifference to the harm to the public being caused by its deputies' reckless and/or high speed driving.  (*Id.* at 14.)

- The other instances of reckless driving causing injury engaged in by CCSO deputies demonstrate the November 18, 2018 collision involving Rissanen that resulted in the death of Megan Eichman was not an isolated incident.  (*Id.* at 14.)

- CCSO's failure to properly train, supervise, and discipline its employees in emergency vehicle operations, with knowledge of their reckless and/or high speed

driving and the risks to the public, reflect an informal custom, policy or practice of the active indifference to the harm caused to members of the public and to the need for better or different emergency vehicle operation training and was a proximal cause for the fatal crash involving Rissanen and Megan Eichman. (*Id.* at 14.)

## II.    <u>Material Facts In Dispute</u>

As discussed below, there are significant disputes of material fact bearing on the lawfulness of Rissanen's conduct, including whether or not his emergency lights were activated *prior* to Ms. Eichman initiating her turn, whether she could have seen them had they been activated, whether Rissanen was driving so fast that it would have been unreasonable for any other driver to anticipate his oncoming speed, and whether Rissanen's off-duty, self-dispatched response served a legitimate law enforcement purpose.  Each of these issues directly bear on the ultimate question the jury will have to resolve regarding whether Rissanen acted deliberately indifferent to Ms. Eichman's life.

A.      **Disputed**:  Whether Rissanen's vehicle emergency lights and siren were operating while he was driving 103 miles per hour down Folly Road prior to Megan Eichman initiating her left turn.  Numerous witnesses to the collision and to Defendant Rissanen's driving in the seconds prior to the crash testified that his blue emergency lights and/or siren were not activated.

<u>Witness Tina Markferding:</u> Ms. Markferding, her husband John, and their friends went to the Kickin' Chicken restaurant at 1175 Folly Road after an evening at the Holiday Festival of Lights.  She was standing in the parking lot facing the roadway when she saw Rissanen's Tahoe drive past them.  She testified that "[W]e heard a car racing down the road and looked and, I mean, it was quick.  And I said, that person is going to kill someone.  And within moments you heard the – an explosion."  (Ex. 22, T. Markferding Tr. 11:2-25.)  Ms. Markferding was clear that the SUV she described had no emergency blue lights or sirens activated—no blue lights flashing in the front grill area, no blue lights in the windshield or on the visors, and none on the side of the vehicle.

(*Id.* Tr. 14:3-24.)  The collision disturbed her so much that the following day she contacted Sen. Tim Scott's office to complain about the driving speeds of emergency vehicles.  (*Id.* 19:16-23:18.)

        <u>Witness John Markferding:</u> Mr. Markferding was in the Kickin' Chicken parking lot and also witnessed Rissanen's Tahoe speed past.  (Ex. 23, J. Markferding Tr. 7:1-21:13.)  He said the noise of the Tahoe's engine approaching from down the road initially caught his attention before it came into view, which he described as "passing by like he was on a racetrack."  (*Id.* 12:14-13:15.)  Mr. Markferding is a mechanic who is familiar with police vehicles but was adamant there were no emergency lights activated on the Tahoe and "absolutely no sirens."  (*Id.* 11:10-21.)

        <u>Witness Molly Duncan</u>:  Ms. Duncan was a witness to the collision who was working at a restaurant, the Lowdown Oven and Bar, which is across from the collision site on Folly Road. She watched the collision occur and called 911 immediately afterwards.  At the scene, she told a CCSO deputy that Rissanen did not have his blue lights operating at the time.

| | |
|---|---|
| Q: | Was there lights and sirens going on the SUV? |
| A: | No. |
| Q: | No lights or anything? |
| A: | No sir, not that I saw. |

(*See* Ex. 24 (M. Duncan video recorded interview at 3:25:14 – 3:25:25).)  Ms. Duncan later testified that she was outside the restaurant with her attention directed toward Folly Road when she saw the collision.  (Ex. 25, Duncan Tr. 11:20 – 15:1.)  Ms. Duncan testified that she witnessed the vehicles immediately prior to the collision: "I saw the sedan coming towards Folly Road.  It looked like she was turning left, and then I saw the other, like vehicle coming; but, you know, that SUV was going so fast that I felt like I heard everything before I actually saw it all kind of happen." (*Id.* 12:11-18.)  Ms. Duncan was clear in her testimony that emergency lights on Rissanen's Tahoe were not activated.  (*Id.* 13:9-20.)  When pressed whether they could have been on immediately prior to the collision, she explained, "I had no way of identifying whether that vehicle was an

emergency vehicle or not.  I felt like I would have seen the lights and been able to tell the 911 operator right away, oh, there's a policeman involved because I would have seen the lights to know."  (*Id.*)  Ms. Duncan was pressed again on the issue, to which she reiterated, "All I can say is that I did not see any light at any point in time."  (*Id.*)[1]

Witness Derek Renckert:  Mr. Renckert was a patron at the restaurant where Ms. Duncan worked and was seated on the outside patio closest to the road.  (Ex. 26, Renckert Tr. 8:18-9:15.) He and his fiancée arrived there for dinner after attending the Holiday Festival of Lights at James Island County Park.  (*Id.* 10:2-6.)  While Mr. Renckert said he did not see the vehicles prior to the collision, he testified "I never saw any emergency lights nor do I recall seeing the headlights."  (*Id.* 14:9-13.)   While acknowledging his prior comment to a law enforcement on the evening of the collision about hearing a siren, he testified at deposition: "Sitting here today, I don't recall hearing a siren. . . . I never saw any emergency lights nor do I recall seeing headlights."  (*Id.* 14:2-13.)

Witness Adam Goodbee:  Mr. Goodbee is a cook at the Lowdown Oven and Bar and was working in the rear of the building at the time of the collision.  (Ex. 27, Goodbee Tr.17:24-18:21.) Mr. Goodbee did not see the collision but recalled hearing it.  (*Id.*. 8:22-25 ("[I]t was extremely loud.  It was hard to miss."); 17:1-3.)  He testified he heard a siren "at least 30 seconds prior to the accident" and that "[t]here was definitely a small window between the siren and the accident, like, you know, at least 30 seconds between hearing the sirens and the accident."  (*Id.* 23:9-19; *see also* 20:19-21:4. ("Q: In reference to the sirens, do you know whether the siren or sirens that you heard were from the officer involved in the collision, Deputy Rissanen, or officers who were responding to the foot chase down the road?  A: I don't know for sure. . . . It quite possibly could have been a

---

[1]     Ms. Duncan's deposition testimony stands in stark contrast to the manner in which it is described in Rissanen's motion for summary judgment.  *See, e.g.*, ECF 83 at 30 (". . . [Y]ou have a witness in Ms. Duncan who cannot say if Rissanen's lights were on prior to impact.").

previous car before the one involved, but it was definitely within, you know, 30 to – 30 second-to-two-minute window of the accident.").

Witness Jeff Sheridan – Mr. Sheridan is a Motorola technician and was asked by the Sheriff's office to inspect Rissanen's vehicle the day after the collision to determine whether his emergency lights and siren were activated at the time of the collision. (Ex. 28, Sheridan Tr. 14:5 – 49:21 and Exs B, C, D)   He testified that six or seven law enforcement personnel from "internal affairs" observed his inspection because "they wanted to know the operational status of the lighting and the sirens in the vehicle."  (*Id.* 20:16 - 22:19; 33:6-25.)  Sheridan described the emergency lighting setup on the vehicle, which included a front light bar, flashing headlights, side mirror flashing lights, flashing tail lights, a visor light at the top of the windshield, side lights in the back side windows facing outward, and a light bar in the back window.  (*Id.* 15:10-16:17.)  Sheridan described the Whelen handheld control module inside the vehicle that controls the vehicle's emergency blue lights and siren, which he found during his inspection to be in pursuit position 3 that activates "every light in the vehicle and the siren simultaneously."  (*Id.* 17:11 – 18:20.)

Sheridan explained that the police equipment in the vehicle, including the lights and siren, are controlled by the "main box" of the system, the HHS2200, that was mounted to the partition cage in the rear of Rissanen's Tahoe, behind the second-row seats.  (*Id.* 28:3 – 30:24 and photographs.)  This device and the adjacent police radio are both powered by a separate battery in the Tahoe, which Sheridan found had been destroyed along with the vehicle's main battery.  So Sheridan had to apply external power to the HHS2200 unit to determine what equipment was working at the time the power was severed.  He found the side emergency blue lights, the rear emergency blue lights, the rear wig-wag flashing lights, the side mirror blue lights, and the visor blue light were all immediately activated and lighting as soon as he applied power.  Even a siren

test noise could be heard coming from the HHS2200 unit. Critically, Sheridan testified that if there had been power to the police equipment in Rissanen's Tahoe after the collision, *those emergency lights that activated during his testing also would have been lighting and flashing on the vehicle had the power not been severed.* (*Id.* 36:2-38:22.)

Yet, Sheridan's findings—albeit accurate as to what he observed the day after the collision—do not accurately reflect the state of Rissanen's vehicle immediately after the collision.[2] Rather, Rissanen's body worn camera, which was inadvertently activated by the force of the collision and/or airbag deployment when Rissanen was still inside the vehicle, provides a clear indication of what equipment was working and what was not. Rissanen had two radios with him— one attached to his uniform and the other installed inside his vehicle. The dash cam video from inside the vehicle shows Rissanen's police radio powered and lighted after the collision and a recording of his radio calls contains significant feedback due to one of Rissanen's two radios broadcasting while the other is receiving, prompting another deputy to interrupt him: "Rissanen, turn your other radio off and tell us where you are!" (Ex. 29, CAD audio at 00:35). This evidence establishes that the collision did not cut power to Rissanen's police radio and emergency equipment as Sheridan had found the following day when he found the battery to be "broken up and destroyed." (Ex. 28, Sheridan Tr. 35:16 - 36:16.)

When Rissanen exits the Tahoe, his body cam footage provides a 360-degree view of his Tahoe as he walks around it, with his vehicle standard brake lights, Motorola police radio, and other electrical equipment operating normally—but critically no emergency blue lights are activated anywhere on his vehicle—none of the side emergency blue lights, the rear emergency

---

[2]    Sheridan was careful to note that he had "no way of knowing" from his inspection whether Rissanen's emergency lights and siren were actually activated prior to the collision. (Tr. 44:20-45:13.)

blue lights, the rear wig-wag flashing lights, the side mirror blue lights, or the visor blue lights that Sheridan found to be operational and activated when he applied power to the system during his inspection.  And no siren test sound can be heard from the HHS2200 unit.  (*See* Ex. 30 (Rissanen post-collision bodycam footage).)  In other words, had the batteries been destroyed in the collision as they were found to be during his inspection the next day, none of the emergency equipment seen and heard operating on Rissanen's body cam could have been operating.

Additionally, Rissanen's statement in his motion that video evidence from a security camera at the Stag Erin bar "shows that Deputy Rissanen's emergency lights were activated at the time of the collision" is pure *ipse dixit*.  Contrary to Rissanen's assertion, the video far from establishes that his emergency lights were activated in the images.  The case notes from the MAIT report, included as Exhibit 2 of Rissanen's motion (*see* ECF No. 43-2) state: "The security system video from Stag Erin Bar was not a stable recording. . . . The video obtained of the security system was taken on a cell phone recording the screen by an employee of the Stag Erin Bar."  Yet, even if the video shows some or all of Rissanen's emergency lights activated in the moment before impact, which is a jury question, it decidedly does not demonstrate that his emergency lights were activated *prior to Ms. Eichman beginning her turn into the parking lot*.  This is a critical fact in dispute, as Rissanen activating his emergency lights after she began the turn, as accident reconstruction expert Poplin opined, "do[es] nothing to alter the limitations of physics" of a vehicle traveling at 103 miles per hour.  The same is true with other videos that Rissanen argues show his lights activated—both of which were recorded at the beginning of his drive and well before he passed the witnesses who unequivocally stated his lights and siren were not activated.  Yet even if Rissanen's emergency lights were intermittently or consistently activated before Ms. Eichman initiated her turn, given the traffic on the road it "cannot be concluded that Ms. Eichman had an

unobstructed view and observed the police lighting of the approaching Chevrolet Tahoe prior to committing to the turn." (Ex. 2, Poplin Report at 8.)

B.    **Disputed**: Whether Rissanen's response to Deputy Carter's location served a legitimate law enforcement purpose or whether it was the response of an off-duty deputy searching for activity on a slow Sunday evening. There is no dispute that the only words spoken by Deputy Carter on the police radio were "Unit 232, dispatch." While Rissanen stated that he interpreted this as some sort of call for assistance, there is also no dispute that Rissanen was off-duty and not directed to respond to Carter's location. Rissanen further testified that in an emergency, it is the patrol supervisor's responsibility to coordinate a response. (Ex. 3, Rissanen Tr. 187:3-15.) He elaborated that even when working an off-duty shift for the Town of James Island, "if anything was to occur, it would be the patrol supervisor who would make any determinations." (*Id.* Tr. 118:18 – 119:13.) But as discussed above, neither the dispatcher, the patrol supervisor, or anyone else affiliated with CCSO directed off-duty Rissanen to respond to Deputy Carter's location. And Rissanen did not report his response to dispatch, his patrol supervisor, or anyone else—something that would be expected if there was an emergency, particularly given the lengthy time and distance he would need to travel to get to Carter's location. Further, in the incident report prepared by Deputy Carter, he made no mention of needing or requesting assistance during his traffic stop, only that he "gave chase to [the suspect who fled on foot] and advised Dispatch of the situation." (Ex. 31, Carter incident report at 2.) Carter stated that based on his law enforcement training and experience, "those who flee late during a traffic stop commonly do so as a 'last-ditch effort' to discard contraband." (*Id.*) Carter also stated that he issued a "courtesy summons" to the suspect after he was apprehended—hardly the response of a law enforcement officer facing a life or death emergency. (*Id.*) Here, Rissanen's reckless conduct, unjustified by any *bona fide* emergency or

21

even an order to assist another deputy, allows the inference that he subjectively knew that his presence was not required or, if it was, this was not an emergency situation justifying aggressive driving, but he nonetheless went about his high-speed driving without any legitimate justification for it and without any regard for other motorists on the road.

C.     **Disputed:** Whether Rissanen had sufficient time to appreciate the danger his high-speed driving posed to other motorists on the road, including Ms. Eichman. Rissanen initiated his high-speed driving from the Blue Water gas station on Folly Road, which is approximately two and a half miles from Carter's location. Rissanen's 100 mile per hour response through this mixed residential and commercial area was not the product of a split-second reaction made in response to a sudden threat, but a deliberate and ongoing decision made as he "passed through two signalized intersections, seven stop controlled intersections, and 51 driveways." (Ex. 2, Poplin Report at 8.) It is undisputed that Rissanen controlled his vehicle's speed at all times, from its standstill at the Blue Water gas station to reaching (at least) 103 mph on Folly Road. Rissanen cannot credibly deny monitoring the police radio, and the computer aided dispatch records make clear that he should have been aware approximately 90 seconds *before the collision* that two other deputies much closer to Deputy Carter's location were responding. Under these circumstances and with sufficient and continuous time for reflection, with 100% control of his actions, and with no suspect forcing him to make instantaneous decisions, Rissanen had ample opportunity to moderate his driving to a level that approached due regard for the safety of others on the road before he approached Ms. Eichman's location and to make unhurried judgments about the perceived need for his response. Since a defendant is unlikely to admit consciously disregarding a grave risk, subjective knowledge may be inferred from circumstantial evidence. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004).

## LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The burden is on the moving party in the first instance to inform "the district court of the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment." *Vardon v. W. Virginia*, No. 2:11-CV-00399, 2012 WL 685863, at *2 (S.D.W. Va. Mar. 2, 2012). In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id.*

## ARGUMENT

I. **Genuine Issues of Material Fact Preclude Summary Judgment on Rissanen's Liability**

    A. Deliberate Indifference Supports a Substantive Due Process Claim Under These Facts

The Due Process Clause of the Fourteenth Amendment prohibits government actors from depriving an individual of her life, her liberty, or her property without due process of law. The Due Process Clause includes a substantive component focusing on the way in which the deprivation is accomplished and is designed to prevent arbitrary government action by an official

"without any reasonable justification in the service of a legitimate governmental objective." *Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citing *Daniel v. Williams*, 474 U.S. 327, 331 (1986)). Courts across the country, including the Fourth Circuit and district courts within it, recognize that a substantive due process violation arises when a law enforcement officer injures or kills a motorist through high-speed and/or reckless driving. *See, e.g.*, *Dean v. McKinney*, 976 F.3d 407, 416 (4th Cir. 2020) ("An officer's action demonstrate deliberate indifference where the evidence shows that the officer subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk . . . . a reasonably jury could conclude that McKinney deliberately operated his police vehicle in a dangerous and reckless manner with full knowledge of the risks involved."); *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1083 (10th Cir. 2015) (observing that the Supreme Court "expressly noted when a private person suffers a serious physical injury 'due to a police officer's intentional misuse of his vehicle' a viable due process claim can arise" (citing *Lewis*, 523 U.S. at 854 n.13)).

The Supreme Court addressed the required culpability level for a substantive due process claim in *Lewis*, confirming negligent conduct is not sufficient but intentional conduct usually will suffice. 523 U.S. at 849. The state actor's conduct must "shock the conscience," and, while the Supreme Court was hesitant to equate this crucial phrase to any traditional tort-based culpability standard, it did find <u>unintentional</u> harm can violate due process. *Lewis* addressed the question in the context of alleged police driving errors during a high-speed pursuit of a motorcycle ending in a collision that killed the motorcycle's passenger. *Id.* at 836-37. The Court ultimately concluded nothing less than intent to harm shocks the conscience when an officer is involved in a high-speed chase because the officer must make instantaneous judgments during a pursuit of a suspect with little opportunity to deliberate. *Id.* at 852-53.

When these time and pressure restraints are loosened, however, an officer need not intend harm to shock the conscience. Drawing on the Court's substantive due process cases in other contexts, *Lewis* found "deliberate indifference" is the proper culpability level for a due process violation when the defendant officer makes an "unhurried judgment[]" after a moment of reflection. *Id.* at 853. What the officer knows about the danger of his driving, what he knows about the exigency of any police business he is pursuing, and the amount of time he has to process this knowledge before making decisions are all key factors to determine when deliberate indifference shocks the conscience. That is because when an officer's "extended opportunities to do better are teamed with protracted failure to even care, indifference is truly shocking." *Id.*

Deliberate indifference is a recklessness standard requiring knowledge of the general risk and knowledge that the conduct is inappropriate in light of that risk. *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). Since a defendant is unlikely to admit consciously disregarding a grave risk, subjective knowledge may be inferred from circumstantial evidence. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). A risk may be so obvious that a deputy cannot credibly deny knowledge of it, and a deputy's conduct can be such a patently inadequate response to that risk that he cannot claim mere negligence. *Moore v. Easley City Police Dep't*, No. 8:16-525-MBS, 2016 WL 1444414, at *2 (D.S.C. Apr. 13, 2016) ("A factfinder may conclude that an officer knew of a substantial risk from the very fact that the risk was obvious. *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)."). The Fourth Circuit has held that when the intent to harm standard does not apply, a state actor's conduct can shock the conscience when it is sufficiently "reckless and irresponsible." *Rucker v. Harford County*, 946 F.2d 278, 282 (4th Cir. 1991).

B.  The Fourth Circuit's Holding in *Dean v. McKinney* Confirms 'Deliberate Indifference' Is the Appropriate Culpability Standard in This Case

In *Dean v. McKinney*, the Fourth Circuit considered the appropriate culpability standard to be applied in a substantive due process claim brought in a case with a remarkably similar fact-pattern involving a deputy sheriff who caused a collision while driving his vehicle "too fast for conditions." 976 F.3d at 412-414. In *Dean*, an innocent motorist sustained severe injuries after an Anderson County deputy sheriff, Stephen McKinney, operating his department-owned Chevy Tahoe at least 38 mph *over* the posted speed limit of 45 mph, collided into her. *Id.* at 411-412. The collision occurred at night after McKinney heard another deputy on the radio requesting assistance. *Id.* In response, a supervisor issued a request on the police radio for available officers to assist the deputy, to which McKinney responded. *Id.* After McKinney began his response, however, the Code 3 emergency response was subsequently canceled. *Id.* Believing the other deputy sounded "shaken" on the radio, McKinney continued driving to the other deputy's location, lost control of his vehicle, and collided into the motorist nearly head-on. *Id.*

And just like Defendant Rissanen in this case,

> McKinney received training on the operation of a police vehicle, including when department policy and state law required him to use his emergency lights and siren, and when and under what circumstances he could exceed the speed limit. His training also included instruction on the risks of night driving. The rules regarding safe vehicle operations were reinforced during remedial counseling McKinney received following his involvement in a series of incidents involving his operation of police vehicles.

*Id.* at 412. The Fourth Circuit rejected McKinney's claim that the "intent to harm" culpability standard applied to his driving misconduct, instead holding that the deliberate indifference standard was appropriate under the circumstances. *See Id.* at 415. ("But unlike the intent-to-harm standard, th[e] [deliberate indifference] standard 'is sensibly employed only when actual deliberation is practical.'" (quoting *Lewis*, 523 U.S. at 851)).

The Fourth Circuit in *Dean* cited approvingly to the Tenth Circuit's decision in *Browder v. City of Albuquerque*, which was authored by then-Circuit Judge Neil Gorsuch. 787 F.3d 1076 (10th Cir. 2015). In *Browder*, the court held an off-duty police officer causing a fatal collision while speeding through a red light—even with emergency lights and siren activated—could be liable for violating the decedent's substantive due process rights. *Browder* further held that deliberate indifference was the proper culpability standard for evaluating the officer's conduct since the facts of the case demonstrated that he had ample time to make decisions regarding his excessively fast driving as opposed to it resulting from a split-second decision. *Id.* at 1081. By driving so fast with adequate time and opportunity to make a safer choice, the court found that a reasonable jury could find the officer showed "conscious contempt for the lives of others" and "reckless indifference to a fundamental right." *Id.* Moreover, even where the confines of substantive due process violations can present close calls, the level of reckless driving marked in *Browder* easily demonstrated deliberate indifference. *Id.* at 1080.

Defendant Rissanen makes absolutely no mention of the Fourth Circuit's decision in *Dean v. McKinney* in his motion for summary judgment. Perhaps recognizing that this binding authority guts his arguments, he instead cites to several outdated and out-of-circuit cases—many of which were decided *before* the Supreme Court's 1998 decision in *Lewis* that established the culpability standard for substantive due process claims. (*See* Rissanen Mot. for Summary Judgment, ECF No. 83 at 15-17 (citing *Roach v. City of Fredericktown*, 882 F.2d 294 (8th Cir. 1989), *Cannon v. Taylor*, 782 F.2d 947 (11th Cir. 1986), *Jones v. Sherrill*, 827 F.2d 1102 (6th Cir. 1987)). These pre-*Lewis* cases are easily distinguishable because they grappled with the question that *Lewis* later settled. Indeed, Rissanen's reliance on the Sixth Circuit's decision in *Jones* is all the more troubling because *Lewis* expressly stated it was resolving a then-circuit split over the culpability

standard to be applied and expressly cited *Jones* when observing that it, too, had been abrogated by the Sixth Circuit three years prior. *See Lewis*, 523 U.S. at 839 n.3. As it stands, *Jones* is widely-recognized as having been abrogated post-*Lewis* and is no longer good law.

Other circuits have encountered facts similar to this case and have applied the deliberate indifference standard to substantive due process claims brought under the Fourteenth Amendment. In *Flores v. City of South Bend*, the Seventh Circuit applied the deliberate indifference standard in a case where a police officer "careened through residential streets and a red light at speeds up to 98 mph to reach a routine traffic stop he was not invited to aid, crashed into [an innocent motorist's] car, and killed her." 997 F.3d 725, 728 (7th Cir. 2021). Similarly, in *Sauers v. Borough of Nesquehoing*, 905 F.3d 711 (3d Cir. 2018), an officer observed a minor traffic violation and followed a car at 100 miles per hour, lost control, and crashed into the plaintiff's car, injuring him and killing his wife. *Id.* at 715, 718. The Third Circuit held that these allegations supported an inference of deliberate indifference on grounds that the officer had time to phone other officers along the violator's route and ask them to effect the traffic stop. *Id.* at 717-18.

C. Rissanen is Not Entitled to Qualified Immunity Because Ms. Eichman's Fourteenth Amendment Rights Were Clearly Established at the Time of the Collision

The final set of cases cited by Rissanen are similarly inapposite because they addressed qualified immunity issues that are not relevant here. Rissanen's qualified immunity defense rests on his mistaken belief that "[t]here is no interpretation of the law at the time that would have indicated to Deputy Rissanen that his rapid emergency response to Deputy Carter's location would have violated Ms. Eichman's 14th Amendment Rights," (ECF No. 83 at 11, 21-22) and, therefore, he is entitled to qualified immunity for his conduct. This assertion has no basis in the law. The Fourth Circuit previously recognized that the presumptive unconstitutionality of law enforcement injuring or killing a motorist on the road through excessive and uncontrollable speeding was

clearly established and known to reasonable officers at the time Defendant Rissanen collided with Megan Eichman on November 18, 2018. *See Dean*, 976 F.3d at 419 ("This substantive due process right was clearly established at the time McKinney engaged in the conduct that caused Harkness's injuries [October 2016]. A reasonable officer in McKinney's position would have known his conduct was not only unlawful, but that it created a substantial risk of serious harm to those around him. As the court stated in *Browder*, some conduct is so obviously unlawful that an officer does not need a detailed explanation."). Significantly, in *Browder*, then-Circuit Judge Gorsuch noted that "as of 2006, it was clearly established a police officer could be liable under the Fourteenth Amendment for driving in a manner that exhibits a conscious-shocking deliberate indifference to the lives of those around him." *Browder*, 787 F.3d at 1081.

### D. The Evidence Shows Rissanen's Deliberate Indifference Caused the Collision

Aside from applying the wrong legal standard and relying on bad case law, the error in Rissanen's due process argument is his insistence that there is no genuine issue of material fact that the collision was merely an unfortunate but typical car accident. The evidence, however, establishes several bases from which a reasonable jury could find Rissanen acted with deliberate indifference.

First, Rissanen deliberately chose to drive more than two and a half times the speed limit along Folly Road. A jury could reasonably infer from the facts that there was no urgency justifying such speeds—indeed, conclude no emergency could justify such high speeds on that road—and that off-duty Rissanen was simply inserting himself into a situation that was already under control.

Second, as discussed above, there is the material dispute of fact regarding whether Rissanen's emergency lights and siren were activated in sufficient time to provide Ms. Eichman prior warning of his approach before she initiated her turn. Whether his lights were activated prior to Ms. Eichman's turn is one part of the equation for the jury—if it concludes they were not

operating at that critical point in time, or if he was intermittently operating his blue lights to reduce the glare inside his windshield, it could easily conclude Rissanen knowingly created an imminent risk of a fatal collision.

Third, Rissanen was traveling at an unconscionably high speed seconds before he crashed into Ms. Eichman's turning car. The portion of Folly Road at issue is poorly unlit and surrounded by homes and commercial storefronts and the state determined that 40 miles per hour is the maximum safest speed for the area—even under daylight conditions where driver visibility is much greater. Yet, the vehicle data from Rissanen's Chevy Tahoe shows he was approaching Ms. Eichman's location at 103 miles per hour in the four and five seconds prior to striking her. Thus, Rissanen was driving at night, on a wet road, on a dimly lit portion of Folly Road, with traffic passing in both the north and south bound lanes of travel, at speeds over 60 miles per hour more than would be safe even during broad daylight on a clear day. Indeed, the physics of a 5,000 pound Chevy Tahoe traveling over 100 miles per hour left Ms. Eichman with no time to safely retreat even if emergency lighting activated after she initiated her turn.

Fourth, Rissanen drove with full knowledge of the difficulties inherent in assessing the speed of an oncoming vehicle. In his words, "I think that would be difficult for a normal person to predict what [an oncoming vehicle's] exact speed would be, unless you had advanced training as a police officer." (Ex.3, Rissanen Tr. 96:9 – 97:8.) And he admitted that when he spotted Ms. Eichman's vehicle, even he could not determine its speed. His concession that his high-speed driving would be difficult for any "normal person" to detect makes it more likely that he consciously disregarded the risk he posed to other drivers on the road that night.

The risks of a fatal crash under these circumstances seem obvious and there can be little doubt that Rissanen knew these risks as part of his basic police training, including training he

received from CCSO that apparently included instruction on the dangers of speeding, the exponentially increased risk of fatal crashes that comes with increased vehicle speeds, the criteria deputies are to weigh when determining an appropriate vehicle speed such as road conditions, traffic, type of area, and distance to be traveled, and instructions to "TRAVEL AT A REASONABLE SPEED," to "EXERCISE DUE REGARD FOR THE SAFETY OF OTHERS!!!," and to query "IS THERE A TRUE NEED FOR YOUR RESPONDING SPEED TO BE 100mph???" (*See* Ex. 32 (Charleston County Emergency Driving Training Materials)). From these facts, a jury could readily conclude that Rissanen's driving reflected conscious contempt for the lives of others. Rissanen admitted that he did not know how fast he was driving down Folly Road, and that it could have been anywhere from 80, 90 or 100 miles per hour. (Ex. 3, Rissanen Tr. 326:7.) Additionally, Rissanen's prior history of losing control of his police vehicle while responding to an emergency should have educated him on the risks of improper driving. (*Id.* Tr. 53:3 – 59:10; Ex. 14 (July 10, 2013 Traffic Collision Report).)

Both the MAIT investigation report and the Poplin report show that Rissanen could have avoided the collision had he been driving at a more reasonable speed:

> Had [Rissanen] been traveling at the posted speed limit, it would have taken 1.65 seconds to travel the same 109.15 feet prior to impact. Given the additional 0.57 seconds (1.65 – 1.08), [Ms. Eichman] would have traveled an additional 14.20 feet. . . . At this point, the collision would not have occurred…"

(Ex. 1, MAIT Report at 11.)

Fifth, there was a sizable time and distance gap between the beginning of Rissanen's driving to his intended destination to permit him sufficient time to make unhurried judgements about, among other things, his purported need to drive over 100 mph on Folly Road. It is undisputed that Rissanen initiated his driving from the Blue Water gas station located at the intersection of Folly Road and Fort Johnson Road, which is approximately one mile from the site

31

of the collision.  (Ex. 3, Rissanen Tr. 316:8-25.)  It is also undisputed that Rissanen was driving to Deputy Carter's location, which was two and a half miles away from him.  The computer aided dispatch notes of radio traffic demonstrate that Rissanen would have learned 90 seconds prior to the collision that other deputies were already responding to the area—establishing that several minutes passed from the time he first heard Deputy Carter on the radio until the collision, which is more than enough time for reflection on the appropriateness of his driving.  Under these facts, actual deliberation was practical.  Indeed, there were no external forces on the road that caused Rissanen to drive fast—his speed was not an instantaneous reaction to anything but a conscious choice that he continually made as he accelerated the Tahoe from 0 mph to 103 mph.

In light of this evidence, a reasonable jury could find Rissanen violated Ms. Eichman's substantive due process rights when approached her car at over 100 miles per hour and struck it moments later.  That same jury could find Rissanen's decision to drive over 100 miles per hour on a dark and wet road populated with other motorists during a two-mile drive outside of his off-duty jurisdiction without being dispatched and without informing his superiors was the product of deliberate indifference to an unjustifiable risk to human life rather than the result of an instantaneous, instinctive, or rushed judgment made without an opportunity for reflection.  The evidence and Rissanen's testimony shows that he traveled a full mile from the Blue Water gas station to the site of the collision with the intent of continuing another mile to Deputy Carter's location—more than a reasonable amount of time to make rationale and unhurried decisions regarding the safe operation of his vehicle and sufficient time to pick up the radio and inform dispatch and his supervisor of his response as he was required to do.  Indeed, Rissanen's deposition testimony shows that he selfishly focused on his own safety and not that of other drivers on the road. (*Id.* Tr. 280:11-25 ("[W]hen I was proceeding down the roadway, I was driving in a capacity

to where I knew it was safe for me as long as no one else pulled out in front of me."). Yet, South Carolina law and common sense required him to drive with "due regard for the safety of all persons." S.C. Code Ann. 56-5-760. Rissanen also testified that he saw Ms. Eichman's car in sufficient time to permit him to reflect on whether it was stationary or moving, that his "first thoughts were, she's doing what every other driver would do; she's pulled over and she's waiting for me to pass by…," that he and Kitchener remarked to each other about watching her car initiate a turn, and that Rissanen's first thought after seeing her turn was "that's a traffic violation." (*Id.* Tr. 279:7-22.)

That same jury could find that Rissanen's emergency lights were not operating at the time of the collision, or that they were turned on only after Ms. Eichman began her turn, or that she was simply not able to see them even if they were activated prior to her turning. A reasonable jury could also find that Rissanen's decision as an off-duty deputy not to inform dispatch or his supervisor of his response or his purported use of emergency lights and siren in violation of multiple departmental policies and his subsequent disregard of radio calls establishing that two *on-duty* deputies much closer to Deputy Carter's location had already acknowledged their response was the product of his calculated assessment that his response was unnecessary, was not justified by any law enforcement objective, and would not be permitted. That same jury could find Rissanen was aware of the on-duty deputies' response and the implication that he would be told to stand down if he reported his response on the radio for, among other reasons, he was working off-duty and he did not have permission from the on-duty supervisor to leave his off-duty post in the Town of James Island.

Finally, a reasonable jury could conclude that even if Rissanen initially thought he was responding to an emergency, that urgency extinguished itself once on-duty deputies much closer

to Deputy Carter reported their response on the radio prior to Rissanen's collision.  At that point, a jury could conclude that, like the officer in *Dean*, Rissanen was just speeding for speeding's sake.  Consequently, he was using the executive power of the state (here, his Sheriff-issued Chevy Tahoe) arbitrarily and with deliberate indifference to Ms. Eichman's life, liberty, and property.

## II.   <u>Negligence Claims Against Rissanen Are Appropriate Under the Tort Claims Act</u>

Given the material disputes of fact coupled with the evidence of Rissanen's excessively reckless driving, a jury could reasonably conclude that he was acting so recklessly that his conduct evinced an intent to harm other motorists on the road.  Yet, Rissanen seeks to dismiss all such state law negligence claims against him (i.e., Plaintiff's negligence, wrongful death, and survival claims) on the basis that the South Carolina Tort Claims Act provides him absolute immunity from liability.  (ECF 43 at 20-21.)  The Tort Claims Act protections against individual liability, however, extend only so much as a jury finds that the individual did not act within the scope of his official duties or act with malice or an intent to harm.  S.C. Code Ann. § 15-78-70(b) ("Nothing in this chapter may be construed to give an employee of a governmental entity immunity from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude.").  In those circumstances, the individual government employee will remain liable for his acts.  *See, e.g.*, *Bellamy v. Horry Cty. Police Dep't*, No. 4:19-cv-03462-RBH-KDW, 2020 WL 2559544, at *5 (D.S.C. Apr. 30, 2020), report and recommendation adopted, No. 4:19-cv-03462-RBH-KDW, 2020 WL 2556953 (D.S.C. May 20, 2020); *Betton v. Knowles*, No. 4:15-cv-04638-AMQ-KDW, 2018 WL 4404073, at *15 (D.S.C. May 21, 2018), report and recommendation adopted, No. 4:15-CV-04638-AMQ, 2018 WL 3744957 (D.S.C. Aug. 7, 2018), aff'd sub nom. *Betton v. Belue*, 942 F.3d 184 (4th Cir. 2019) ("Because the undersigned has determined that questions of fact remain concerning Belue's alleged unlawful entry and his alleged use of excessive

force, whether Defendant is entitled to statutory immunity also remains a genuine issue of material fact on the trespass and assault and battery allegations.").

Further, because Defendant Charleston County Sheriff's Office and/or the Town of James Island may argue at trial that Rissanen's reckless conduct was not within the scope of his official duties, Rissanen must remain a named defendant on all state law negligence claims. Accordingly, a jury must first determine whether Rissanen acted within or without the scope of his employment or whether he acted with malice or intent to harm. If so, the Court can then properly determine whether Rissanen is subject to Tort Claims Act immunity as a governmental employee.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests the Court enter an Order denying Defendant Rissanen's motion for summary judgment.

Respectfully submitted,

**McLEOD LAW GROUP, LLC**
Post Office Box 21624
Charleston, South Carolina 29413
(843) 277-6655

*s/ Colin V. Ram*
Colin V. Ram, No. 12958
W. Mullins McLeod, Jr., No. 7142
colin@mcleod-lawgroup.com

*Attorneys for Plaintiff*

April 28, 2023
Charleston, South Carolina

**STAVRINAKIS LAW FIRM**

Leon Stavrinakis
One Cool Blow Street, Suite 201
Charleston, SC 29403