**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| NEIL EICHMAN, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MEGAN R. EICHMAN | ) ) ) ) | Civil Action No.: 2:20-04057-BHH |
| Plaintiff, | ) ) ) | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT** |
| v. | ) ) | **CHARLESTON COUNTY SHERIFF'S OFFICE'S MOTION FOR** |
| AUSTIN RISSANEN, in his individual capacity; CHARLESTON COUNTY SHERIFF'S OFFICE; and TOWN OF JAMES ISLAND, | ) ) ) ) ) | **SUMMARY JUDGMENT** |
| Defendants. | ) | |

Plaintiff Neil Eichman, as Personal Representative of the Estate of Megan R. Eichman, respectfully submits his Response in Opposition to the motion for summary judgment filed by Defendant Charleston County Sheriff's Office, (ECF No. 84). For the reasons set forth below, Defendant Charleston County Sheriff's Office's motion should be denied and Plaintiff claims should proceed to trial.

## RELEVANT FACTUAL BACKGROUND

In opposing Defendant CCSO's motion for summary judgment, Plaintiff incorporates by reference the full factual background set forth in his memorandum in opposition to Defendant Rissanen and Defendant Town of James Island's motions for summary judgment, including the significant disputes of material fact. Additionally, Plaintiff highlights the following evidence that bears specifically on the legal arguments raised in Defendant CCSO's motion.

### I. CCSO's Policies and Procedures

The Charleston County Sheriff's Office has several policies and procedures that govern deputies' performance of their law enforcement duties. Compliance with these policies and

1

procedures is not merely suggested, but is mandatory according to CCSO. (Ex. 1, CCSO Rule 30(b)(6) Tr. 54:2-22.) The Vehicle Operations Policy and Procedure 1-08 (*see* ECF No. 86, Ex. 9) explains the expected response to calls for service. Section III.G.3 of the policy states that "Radio contact must be maintained while operating the vehicle. Deputy sheriffs will advise the CDC [consolidated dispatch center] when in proximity of an emergency call." (*Id.* at 2.) Section V of the policy provides the procedure for responding to calls for service. (*Id.* at 8.) Bullet point 2 explains that the dispatcher will select the unit(s) within the service area closest to the call for service. (*Id.*) Bullet point 4 explains that when responding units change their response code [i.e. from Code 1 to Code 3] they are to immediately notify CDC and the patrol supervisor. (*Id.*) Units responding Code 3 (i.e., with emergency lights and sirens activated) must respond "with paramount consideration for the safety of the public and the deputy sheriff." (*Id.* at 9.) The policy requires deputies to balance the risk of their response against factors such as road conditions, vehicle traffic, and the distance to be traveled. (*Id.* at 9-10.)

Although Deputy Rissanen was not involved in a vehicle pursuit, several of the standards set forth in the Sheriff's Office's Vehicle Pursuit Policy and Procedure regarding emergency driving are equally applicable to emergency vehicle operations. (*see* ECF No. 86, Ex. 10.) Vehicle Pursuit procedure 6-12 IV.B.1. states that "All emergency vehicle operations will be conducted in strict conformance with applicable state statutes." (*see* ECF No. 86, Ex. 11 at 3.) Section IV.B.2 provides that the "use of emergency lights and siren does not relieve a deputy sheriff from the responsibility of driving defensively and with due regard for the safety of other drivers, bicyclists, and pedestrians. When using emergency equipment, the deputy sheriff is requesting the right of way and does not have absolute right of way to indiscriminately disregard traffic lights or stop signs." (*Id.* at 3-4.) Section IV.B.6 provides that "deputy sheriffs will not drive with reckless

2

disregard for the safety of others." (*Id.* at 5.) The policy also includes a requirement that a deputy inform dispatch of the emergency driving and limits the number of vehicles involved in the vehicle pursuit emergency response to two units for safety reasons. (*Id.*)

The Sheriff's Office's Communications Procedure 4-09 discusses radio use requirements during emergency responses. (*see* ECF No. 86, Ex.8.) Section III.A.3 provides that the duties of the dispatch center include "dispatching, coordinating, and monitoring radio communications for deputy sheriffs and other law enforcement, emergency and public safety personnel." (*Id.* at 2.) Section III.J outlines procedures for radio communications between deputies and dispatch, including a requirement in III.J.6 that "Deputy sheriffs will advise the 911 center . . . when acknowledging a call," a requirement in III.J.8 that "Deputy sheriffs will acknowledge receipt of the call; advise when they are enroute and method of response, such as Code 1, 2, or 3." (*Id.* at 12-13.) Section III.K of the policy outlines the "Criteria to Determine the Number of Sworn Personnel Dispatched" to a response, with the standard response being a single unit and setting forth circumstances where two or more responding units may be required. (*Id.* at 15.)

Plaintiff's law enforcement expert, Dr. Roy T. Taylor, testified that the above policies are consistent with national accepted standards for policing. (*see* ECF No. 86, Ex. 21, Taylor Tr. 79:23 – 80:7; 160:22 – 161:3.) In other words, the relevant policies at issue in this case merely reflect what is already recognized as generally accepted law enforcement standards. (*Id.*). Thus, the issue is not the adequacy of CCSO's policies, but whether CCSO and Defendant Rissanen, comported with those generally accepted law enforcement standards on November 18, 2018.

Following the collision and death of Ms. Eichman, the South Carolina Highway Patrol MAIT team investigated the collision and concluded that had Rissanen been driving the posted speed limit, "the collision would not have occurred." (*see* ECF No. 86, Ex. 1, MAIT Report at

11.) Plaintiff's accident reconstruction expert Woodrow Poplin also analyzed the various speeds at which Rissanen could have driven without colliding into Ms. Eichman's vehicle, concluding that even if Rissanen had been driving as fast as 94 mph, the collision would have been avoided. (*see* ECF No. 86, Ex. 2, Poplin report data at 60.)

Yet, the Charleston County Sheriff's Office conducted its own internal investigation and concluded that, in its view, Rissanen had done nothing wrong, but issued him a Letter of Instruction for not wearing his seat belt. (*see* ECF No. 86, Ex. 12, Letter of Instruction.) Rissanen's punishment for driving 100 miles per hour along Folly Road and killing a young woman was to write a "research report on seat belt safety" that would be no more than two pages in length discussing the importance of seat belt use. (*Id.*) Rissanen testified that he completed the paper, but could not recall where we wrote it, how long it was, or what the Sheriff's Office did with it. (*see* ECF No. 86, Ex. 3, Rissanen Tr. 385:6 – 386:24.) When asked to produce a copy of Rissanen's remedial "research report" in discovery, CCSO said it was unable to locate it (despite its years-long legal obligation to preserve all relevant evidence in this case). (*see* ECF No. 86, Ex. 13, CCSO's Response to Plaintiff's Fourth Set of Requests for Production, No. 2.) The Letter of Instruction also required Rissanen to use an agency vehicle equipped with a dash camera on all future off-duty assignments, but according to Rissanen this requirement was later rescinded. (*see* ECF No. 86, Ex. 3, Rissanen Tr. 387:10 – 388:20.)

The November 18, 2018 collision with Ms. Eichman was not Defendant Rissanen's first vehicle collision during an emergency response. He previously lost control of his police vehicle while responding to a scene with emergency lights and sirens activated before he was hired as a deputy by CCSO. (*see* ECF No. 86, Ex. 14, July 10, 2013 traffic collision report.) Yet, despite

being on notice of Defendant Rissanen's poor emergency driving history, Defendant CCSO provided him with no remedial driver training.

Indeed, CCSO provides little to no practical training to deputies on how to drive safely at high speeds. Rather, deputies receive only brief high-speed driver training during the basic Class I law enforcement course at the South Carolina Criminal Justice Academy, and no hands-on high-speed driver training once they are sworn in as deputies. (*see* ECF No. 86, Ex. 7, Lucas Tr. 119:25 – 122:24.) In its Rule 30(b)(6) deposition, CCSO's designee could only guess as to what high-speed driver training Rissanen received, suggesting that it included what the Sheriff's office terms as "life experience," meaning general driving experience prior to becoming a law enforcement officer, driver training at the Criminal Justice Academy training, and field training when deputies first join CCSO. Yet, CCSO admitted in testimony that it does not have any knowledge of "the highest speed that students at the Criminal Justice Academy are trained to drive." (Ex. 1, CCSO 30(b)(6) Tr. 100:19-25.) Nevertheless, CCSO testified that on one occasion during Defendant Rissanen's field experience, he drove 100mph on Interstate 26 to catch up with a speeding violator. (*Id.* at 103:16 – 104:17.) But CCSO's designee admitted that it has no knowledge of Rissanen receiving field training on how to drive at high speeds on non-Interstate roadways. (*Id.* 104:14-17.) Additionally, Rissanen apparently received annually approximately 18-20 minutes of precision driving training on a closed course, to include techniques such as backing up, navigating a vehicle through traffic cones at speeds of 30 to 40 mph. (*Id.* 109:7 – 110:13; *see also* Tr. 112:01-02 ("But as far as high speed, no, we're not out there driving a hundred miles an hour or another on the track.") The driving training course has a strict speed limit of 40 mph. (*Id.* 119:15-22; *see also* Ex. 32 Training Outline.)

In short, Defendant CCSO arms its deputies with high-speed vehicles capable of driving on Charleston County roads at excessively high speeds, but provides its deputies scant training on how to operate them safely. Former Assistant Sheriff Mitch Lucas, who was in charge of the Charleston County Sheriff's Office at the time of Ms. Eichman's death, testified candidly to this fact:

> Q: So how would the sheriff's office ensure that the deputies who are out there patrolling are competent to operate their law enforcement vehicles at high speeds?
>
> A: I'm not sure there's a way that you can.

(*see* ECF No. 86, Ex. 7, Lucas Tr. 122:20-24.)

CCSO's inability to ensure its deputies are competent to drive at high speeds has repeatedly resulted in serious injuries and deaths of Charleston County citizens, including Ms. Eichman and numerous others. Examples of recent collisions caused by CCSO's high-speed driving include: [1]

- **May 21, 2020** – CCSO deputy driving 74 mph while not responding to an emergency call for service or in pursuit of an actual or suspected violator of the law without any flashing blue lights or sirens activated at the time of his collision, crashing into a civilian and killing him.[2]

- **Jan. 3, 2021** – CCSO deputy driving 130 mph just after noon on a Sunday in Mount Pleasant when responding to a non-emergency call in which two other deputies are responding Code 1 (i.e., non-emergency driving), crashing into a car carrying two people, killing them both.[3]

---

[1]   Plaintiff requests the Court take judicial notice of these facts from the sources cited below under Fed. R. Evid. 201 as the information cited is generally known within the trial court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned. Specifically, the complaint and answer filed in *Jenkins v. Barry*, CCSO dash camera video recording of the Jan. 3, 2021 high speed collision released to the media by CCSO, and the videotaped public statements of Sheriff Graziano regarding the Mother's Day collision cited below.

[2]   *See Estate of Ronald Jenkins v. Jason Barry and CCSO*, No. 2021-CP-1000300 (Chas. Cty.) Complaint at ¶¶ 10-11 and Defendant Barry's Answer.

[3]   *See Estate of Sandra Eisner v. Charleston County Sheriff's Office et al.*, Case No. 2:23-cv-217-RMG (D.S.C.). Dash cam video obtained from CCSO depicting the deputy's high speed

- **May 8, 2022** – CCSO deputy runs stop sign at 73 mph, without operating emergency lights or siren, crashing into car carrying a mother and her two adult daughters returning home from a college graduation and Mother's Day celebration. All three women are killed. Sherriff Graziano announced at a June 7, 2022 press conference: "I also believe that speed was a contributing factor and I don't know the exact speed yet, we don't have that information, but I know that it, based on what we saw, and I think we all agree on speed was a factor in this particular incident. These facts are undisputed, there's absolutely no question about that. That has not changed."[4]

**LEGAL STANDARD**

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The burden is on the moving party in the first instance to inform "the district court of the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id.*

---

driving through daytime traffic and his vehicle speed of 130mph is available at: https://abcnews4.com/news/local/video-video-shows-how-fast-charleston-co-deputy-was-going-seconds-before-fatal-crash?video=65b968e298204042add0df6c21d2b2eb (last visited April 28, 2023).

[4] A video recording of Sheriff Graziano's statement that speed was a contributing factor in the women's deaths is available at https://www.live5news.com/2022/06/07/sheriff-deputy-ran-stop-sign-deadly-crash-that-killed-mother-daughters/ (last visited April 28, 2023).

**ARGUMENT**

I.   **CCSO is Subject to § 1983 Liability**

Defendant CCSO seeks summary judgment of Plaintiff's § 1983 claim on narrow procedural grounds: (A) that the Eleventh Amendment bars this court from hearing any of Plaintiff's claims against CCSO; and (B) that CCSO is not a "person" subject to suit under § 1983. As discussed below, neither argument bars Plaintiff's claims.

A.   CCSO Voluntarily Waived Its Eleventh Amendment Immunity

CCSO argues that Plaintiff's § 1983 claim is barred under the doctrine of Eleventh Amendment immunity, but failed to appreciate that it voluntary waived such immunity over two years ago when it removed this case to federal court.  Plaintiff filed this lawsuit in the Court of Common Pleas for the Ninth Judicial Circuit, Charleston County on October 16, 2020.  Defendant CCSO thereafter filed a Notice of Removal thereby voluntarily waiving its Eleventh Amendment immunity.[5]  See ECF No. 1 ("Defendant Charleston County Sheriff's Office Notice of Removal" filed Nov. 20, 2020). The Supreme Court has made clear that when a state actor voluntarily removes an action to federal court, it waives its right to assert Eleventh Amendment immunity. *See Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 624 (2002); *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 481 (4th Cir. 2005) (observing that the Supreme Court "has consistently held that a State's voluntary appearance in federal court effects a waiver of Eleventh Amendment immunity."). In *Lapides*, a plaintiff sued several defendants, including the Board of Regents of the University System of Georgia and all defendants there joined in removing the case to Federal District Court. 535 U.S. at 616. The *Lapides* Court reasoned that "removal is a form of voluntary invocation of a federal court's

---

[5]   Defendant CCSO also failed to assert Eleventh Amendment immunity in its answer.  (*See* ECF No. 5.)

8

jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here

of state law) in a federal forum." *Id.* at 624. The Court stated:

> It would seem anomalous or inconsistent for a State both (1) to invoke federal
> jurisdiction, thereby contending that the "Judicial power of the United States"
> extends to the case at hand, and (2) to claim Eleventh Amendment immunity,
> thereby denying that the "Judicial power of the United States" extends to the case
> at hand. And a Constitution that permitted States to follow their litigation interests
> by freely asserting both claims in the same case could generate seriously unfair
> results.

*Id.* at 619. Accordingly, CCSO has waived its Eleventh Amendment immunity.

### B. CCSO is a "Person" Subject to Suit Under § 1983

CCSO next argues that it is not a "person" amenable to suit under § 1983. While Plaintiff

recognizes the Supreme Court precedent cited by CCSO on this issue, *see, e.g.*, *Will v. Mich. Dept't*

*of State Police*, 491 U.S. 58 (1989) (holding that a state is not a "person" under § 1983), Plaintiff

maintains that the reasoning in *Will* does not support extending that holding to the Charleston

County Sheriff's Office.

In *Will*, the Supreme Court held that a state is not a "person" within the meaning of § 1983.

The Court provided essentially three reasons for this conclusion. First, although the text of § 1983

does not define the term "person," the Court relied on the language of § 1983 and the meaning of

the word "person" under the Dictionary Act. 491 U.S. at 64-66. Second, the Court reasoned that

§ 1983 was enacted to provide "a federal forum to remedy many deprivations of civil liberties"

and that, since an unconsenting state could not be sued in federal court by virtue of the Eleventh

Amendment, Congress could not have intended for § 1983 to provide a claim that could be asserted

against a state. 491 U.S. at 66–67. Third, the Court noted that since states enjoyed sovereign

immunity from suit under common law, § 1983 was not intended to override "well established

immunities or defenses under common law." 491 U.S. at 67.

The Court's reasoning in *Will* does not support CCSO's position in this case. First, the "Dictionary Act" (the Act of Feb. 25, 1871 § 2, 16 Stat. 431), which was quoted by both the *Will* majority (491 U.S. at 69) and the dissent (*id.* at 78, 109 Brennan, J., dissenting), defined the term "person" as generally applying to "bodies politic and corporate." As the dissent in *Will* recognized, "[b]oth before and after the time when the Dictionary Act and § 1983 were passed, the phrase 'bodies politic and corporate' was understood to include the States." *Will,* 491 U.S. at 79 (Brennan, J., dissenting.)

The second reason cited in *Will*—that § 1983 was not intended to create a cause of action that would be barred in federal court by the Eleventh Amendment—also provides no assistance to CCSO. As discussed above, CCSO voluntarily and expressly waived its Eleventh Amendment immunity in this case when it removed it to federal court. Because CCSO can no longer show entitlement to Eleventh Amendment protection in this case (as it might in others), this portion of the *Will* analysis does not support CCSO's argument.

The third reason cited in *Will*—that § 1983 was not intended to override well-established common law immunities—likewise does not support CCSO's claim. Even if entities like CCSO enjoyed sovereign immunity under common law and were likewise immune from § 1983 claims, it would not follow that those entities would be entitled to Eleventh Amendment protection. *Will* concluded that "the scope of the Eleventh Amendment is a consideration" when "deciphering congressional intent as to the scope of § 1983." 491 U.S. at 66–67. It clearly would be illogical, however, to rely on the scope of § 1983, a statute whose predecessor was enacted in 1871, in attempting to determine the meaning of the Eleventh Amendment, a constitutional provision adopted in 1798. As for any argument that sovereign immunity provides CCSO with support, that too is unavailing. The State of South Carolina has expressly waived sovereign immunity for claims

10

brought against Sheriff's offices by virtue of providing citizens with a statute of limitations period of three years to bring suit against one. *See* S.C. Code Ann. § 15-3-540 (applying a three-year limitations period to "An action against a sheriff, coroner or constable upon a liability incurred by the doing of an act in his official capacity and in virtue of his office or by the omission of an official duty.")

Further, acceptance of CCSO's argument that it is not a "person" under § 1983 would impermissibly broaden the scope of the Eleventh Amendment. CCSO concedes that it is not the State of South Carolina, but "an agency of the State." (ECF No. 84 at 6.) Thus, if CCSO's reasoning that *Will*'s pronouncement that a state is not a "person" under § 1983 extends to agencies of a state, each state legislature apparently could confer Eleventh Amendment protection on any entity it wished, including counties and cities, by enacting a statute cloaking those entities with "sovereign immunity" from suit on state claims.

In *Howlett v. Rose*, 496 U.S. 356 (1990), decided after *Will*, the Court made clear that federal law determines who is a "person" under § 1983, not state law. In rejecting a Florida law that extended immunity from state court actions under § 1983 not only to the state and its arms, but also to municipalities, counties, and school districts otherwise subject to suit under § 1983, the Court stated:

> Congress did take common law principles into account in providing certain forms of absolute and qualified immunity and in excluding States and arms of the State from the definition of person. But as to persons that Congress subjected to liability, individual States may not exempt such persons from federal liability by relying on their own common law heritage. If we were to uphold the immunity claim in this case, every State would have the same opportunity to extend the mantle of sovereign immunity to "persons" who would otherwise be subject to § 1983 liability. States would then be free to nullify for their own people the legislative decisions that Congress has made on behalf of all the People.

496 U.S. 356, 383 (citations omitted). Thus, to the extent that CCSO relies on common law precedent to justify its existence as an "agency" of the State of South Carolina, such reasoning does not work to extend the holding of *Will* to excluded it from the definition of "person" under § 1983.

## II. CCSO Failed to Demonstrate the Absence of a Genuine Dispute of Material Fact on the Issue of Comparative Negligence

CCSO's argument that Plaintiff's state law claims are "barred" due to alleged comparative negligence fails for several reasons. First, Defendant CCSO failed to meet its burden to establish the wholesale absence of any genuine dispute of material fact on the issue of negligence. Second, in raising its comparative negligence affirmative defense, Defendant CCSO erroneously argues that it is not liable for Defendant Rissanen's conduct unless it can be proven that he acted in a grossly negligent manner—a statutory standard that applies only in limited circumstances not applicable to this case.

The defense of comparative negligence is an affirmative defense. Defendant CCSO bears the burden of proving it. *Mills v. S.C. State Ports Auth.*, 435 S.C. 213, 223, 865 S.E.2d 910, 915 (Ct. App. 2021). "The determination of the respective degrees of negligence attributable to the plaintiff and the defendant is a question of fact for the jury, at least where conflicting inferences may arise." *Id.* at 433, 532 S.E.2d at 614-15.

CCSO's comparative negligence argument is misleading because it omits material facts bearing on Rissanen's negligent conduct—namely, that Rissanen was driving 103 mph (two and a half times the 40 mph speed limit) on a wet road at night with traffic. Rather than present these facts upon which each party's liability can be weighed, CCSO simply alleges that because Ms. Eichman's post-mortem blood alcohol content was allegedly high, she must be solely responsible for the collision. But the facts in this case are far from the simple narrative that CCSO casts.

12

A.      <u>Rissanen Was Driving at an Excessively High Speed In Active Traffic</u>

Defendant Rissanen's excessive and high driving speed in the seconds prior to the collision is well documented and not in dispute by the parties.  The vehicle data recovered from Rissanen's Chevy Tahoe by the South Carolina Major Accident Investigation Team ("MAIT") at the scene revealed his speed immediately prior to the collision:

- 103 mph at -5.0 seconds prior

- 103 mph at -4.0 seconds

- 101 mph at -3.0 seconds

- 91 mph at -2.0 seconds

- 76 mph at -1.0 seconds

- 79 mph at -0.5 seconds

(*see* ECF No. 86, Ex. 1, MAIT report at 12; *see also* (*see* ECF No. 86, Ex. 2, Poplin Report at 5 and 30 (vehicle data report); (*see* ECF No. 86, Ex. 3, Rissanen Tr. 264:11-21.)

Rissanen was driving his unmarked Chevy Tahoe in the northbound lanes of Folly Road, from the Blue Water gas station at the intersection of Folly Road and Fort Johnson Road to the site of the collision adjacent to 1006 Folly Road—a mixed commercial and residential section of the road.  Plaintiff's accident reconstruction expert recorded a video of this route. (*see* ECF No. 86, Ex. 16, Poplin video.)   In the approximate one-mile distance that Rissanen traveled from the gas station until the collision, he passed "two signalized intersections, seven stop controlled intersections and 51 driveways."  (*Id.*; *see also* (*see* ECF No. 86, Ex. 2, Poplin report at 8.)

While the issue of whether Rissanen's emergency blue lights and/or siren were activated prior to collision is heavily disputed, even assuming *arguendo* that they were continuously activated during Rissanen's drive along Folly Road, "[i]n this area, traffic is potentially actively

entering and existing the travel lanes to the left, to the right and to the center. Any intervening traffic could potentially be a visual obstruction for one driver and not another." (*see* ECF No. 86, Ex. 2, Poplin report at 8.) Indeed, in the approximately 97 second time frame leading up to the collision, surveillance video shows <u>nine</u> southbound vehicles and <u>eight</u> northbound vehicles passing the collision area, including a northbound vehicle (in Rissanen's direction of travel and just ahead of him) passing the collision area approximately 2.8 seconds before the collision. (Ex. (*see* ECF No. 86, Ex. 2, Poplin report at 8; (*see* ECF No. 86, Ex. 24, Stag Erin video). CCSO's law enforcement expert, Dean Esserman, similarly counted "[a]bout 10 to 20 cars in the 30 to 60 seconds of the video in both directions." (Ex. 2, Esserman Tr. 185:12-15.) Any one of these vehicles could have obstructed Ms. Eichman's view of Rissanen's vehicle or the limited emergency lighting on his vehicle if it was, in fact, activated. Yet, as Mr. Poplin opined, even if Rissanen's emergency lights were activated continuously prior to the collision (rather than turned off or operating intermittently) and even if Ms. Eichman saw the emergency lighting, "the shallow approach angle between the vehicles would make it difficult to assess the actual speed" of Rissanen's Tahoe. (*see* ECF No. 86, Ex. 2, Poplin report at 8.)

B.      Based on Rissanen's Distance from Ms. Eichman, It Would Have Been Difficult to Accurately Determine His Approach Speed

Plaintiff' human factors expert, Dr. Kevin Rider, agreed with Poplin, offering his opinion that "[b]ased on the distance of Mr. Rissanen's vehicle prior to Ms. Eichman's turn, it would have been difficult for a southbound driver to accurately assess Mr. Rissanen's speed." (*see* ECF No. 86, Ex. 18, Rider report at 7.). As Dr. Rider explained:

> "[D]river research shows that it is also difficult for drivers to accurately assess the speeds of vehicles that are traveling directly to or away from them. Drivers tend to expect that other vehicles are traveling at or near the speed limit, and their ability to discern the speed of oncoming vehicles is primarily dependent on how fast the oncoming vehicle appears to be growing in their field of view. This "perceptual

> looming effect" limits a driver's ability to recognize that an oncoming vehicle is speeding."

(*Id.*). Defendants' human factors expert, Stephanie Borzendowski, also agrees: "The further away the oncoming vehicle is, the less expansion is occurring of the visual image of the vehicle. And so judging arrival time is more difficult, and drivers are less accurate when the vehicle is further away. . .") (Ex. 3, Borzendowski Tr. 48:22 – 49:21.) Indeed, Ryan Spodar, the witness who claims he saw Rissanen's emergency lights activated prior to the collision, admitted that he had trouble determining if Rissanen's vehicle—which unquestionably was speeding on Folly Road at the time—was stationary or moving. (Ex. 4, Spodar Tr. 56:14 – 57:5.) For his part, Rissanen also admitted that when he saw Ms. Eichman's vehicle, he could not determine whether it was moving or not in the median lane prior to her turn. (*see* ECF No. 86, Ex. 3, Rissanen Tr. Tr. 266:15 – 267:15 ("To me it appeared like she was stopped, but it may have been because from my vantage point she was just very, very slowly moving down the median.").) Rissanen further conceded that it is difficult for a normal person to predict how fast approaching vehicles are traveling unless they have advanced training like he does. (*see* ECF No. 86, Ex. 3, Rissanen Tr. 96:9 – 97:8.) If Rissanen, a law enforcement officer with "advanced training" on estimating vehicle speeds could not determine Ms. Eichman's speed when looking at her car, a jury can reasonably infer that Ms. Eichman, a civilian with no such training, would have even more difficulty assessing Rissanen's speed when looking in his direction. Rissanen's recognition of the difficulty for a normal person to predict approach speeds of vehicles, of course, should have been a red flag to not drive 103 mph on a 40 mph road.

C.  Rissanen's Vehicle Data and Perception Reaction Time ("PRT") Establish He Was More Than 392 Feet Away from Ms. Eichman When She Began Her Left Turn

Rissanen's heavy brake application in the seconds prior to the collision provides key data that establishes his distance from Ms. Eichman at the time she initiated her turn. Prior to braking, a driver must perceive the need to do so, such as when approaching a stop sign or a red traffic signal. The time interval between a driver perceiving the need to brake (i.e., detecting and identifying a potential hazard) and then applying the brakes is known as the Perception Reaction Time ("PRT"). As Dr. Rider explained in his report and testimony:

> Expectations affect a driver's expected PRT, which can be as short as 0.7 seconds in response to expected events that elicit simple responses, particularly when the driver's foot is already applying the brake pedal. When drivers are alerted to potential hazards, PRTs under 1.0 second have been demonstrated when the hazard is expected. . . . The vehicle conflict of an oncoming and left-turning vehicle is one of the most common and well-studied vehicle crash scenarios. According to the analysis, under the most favorable conditions for Mr. Rissanen, he could have initiated his braking response in as little as 0.7 seconds. (If his foot was not already "covering the brake", 0.25 seconds should be added to the analysis for movement of the foot from the accelerator to the brake pedal.)

> Mr. Rissanen testified that he observed Ms. Eichman's vehicle and that it appeared to be stopped in the median turn lane. Although he also testified that he did not see Ms. Eichman's vehicle until right about when the collision happened, the EDR download reported that his brakes were activated at least 2.5 seconds prior to the reported collision. Along with Mr. Poplin's determination of braking beginning at 2.2 seconds prior to impact, a range of 2.2 to 2.5 seconds is used in the following analysis.[6] **With a minimum PRT of 0.7 seconds, the lateral movement of Ms. Eichman's vehicle and/or headlights would then have been detectable between 2.9 and 3.2 seconds prior to the collision.**

(*See* ECF No. 86, Ex. 18, Rider report at 6-7; (*see* ECF No. 86, Ex. 19, Rider Tr.)

---

[6]  The Tahoe's vehicle data shows that Rissanen began to apply hard braking approximately 2.5 seconds before impact, which Mr. Poplin refined to a more conservative 2.2 seconds. (*see* ECF No. 86, Ex. 2, Poplin report at 6; (*see* ECF No. 86, Ex. 15, Poplin Tr. 88:7 - 91:23.)

16

Based on well-established PRT data, Dr. Rider then calculated Rissanen's distance from Ms. Eichman:

> According to the EDR download from Mr. Rissanen's vehicle, he was traveling approximately 100 mph (146.6 fps) prior to braking. Including Mr. Poplin's determination of 2.2 seconds and 290 feet of Mr. Rissanen's braking distance, and the additional 0.7 seconds of pre-braking travel at 100 mph, **Mr. Rissanen would have been at least 392 feet from impact when Mr. Rissanen detected Ms. Eichman's turning movement, and further away if the 2.5 seconds of braking is accurate. From a distance of 392 feet, had Mr. Rissanen been traveling at the speed limit of 40 mph (58.7 fps), it would have taken him approximately 6.7 seconds to reach the collision point.** Ms. Eichman's evaluation of oncoming traffic and her decision to turn would have occurred, prior to her actual steering of the vehicle, at which point Mr. Rissanen would have been even further away.

(*see* ECF No. 86, Ex. 18, Rider report at 6-7; *see also* (*see* ECF No. 86, Ex. 19, Rider Tr.)  In sum, Rissanen's vehicle was at least 392 feet (130 yards) away from Ms. Eichman's vehicle when she began her left-hand turn.

### D. Ms. Eichman Reasonably Perceived a Sufficient and Safe "Gap" Between Her Vehicle and Rissanen's Tahoe When She Began Her Left Turn

Prior to initiating a left turn across traffic, drivers determine whether there is adequate time to safely complete the turn based on the perceived distance of the oncoming traffic.  Dr. Rider explained this concept as "gap acceptance."  (*see* ECF No. 86, Ex. 18, Rider report at 8; *see also* (*see* ECF No. 86, Ex. 19, Rider Tr.)  Yet, "at night, the primary visual cue available is the oncoming vehicle's headlights, which provides some indication of vehicle distance and little to no useful information regarding the vehicle's speed." (*Id.* at 12; *see also* (*see* ECF No. 86, Ex. 19, Rider Tr.).  Additionally, "drivers tend to expect that other vehicles are traveling at or near the posted speed limit, and the presence of emergency vehicle lighting is not a reliable means to understand that an emergency vehicle is traveling 2.5 times the speed limit, on an unlit roadway at night, with other vehicle traffic in the area of dozens of commercial properties." (*Id.* at 11; *see also* (*see* ECF No. 86, Ex. 19, Rider Tr.)  Thus, it would have been entirely reasonable for Ms. Eichman to have

spotted Rissanen's approaching headlights (and even emergency lighting if it was activated) and concluded that he was a far enough distance away that she could safely complete her turn and clear the roadway.

Because gap acceptance is a determination based on a driver's perception of the *distance* of approaching traffic, and because drivers expect oncoming traffic to be traveling at or close to the posted speed limit, it was reasonable for Ms. Eichman to conclude there was a safe enough distance to make her turn and clear the roadway. As discussed above, based on Rissanen being *at least* 392 feet away from Ms. Eichman when he first detected her turning movement, and based on a reasonable assumption by her or any driver that his vehicle was reasonably traveling the speed limit of 40 mph, it would have taken him 6.7 seconds to reach the collision point at that speed.[7] Based on published data, had Rissanen been traveling an expected 40 mph with a gap of 6.7 seconds, between 63% and 82% of drivers would choose to turn left across his path. (*Id.* at 9.) According to Dr. Rider, "[h]ad Rissanen been traveling 100 mph with a 6.7 second gap, he would have been approximately 982 feet away – **more than 3 football fields** – a distance at which nearly all drivers would decide to initiate the left-hand turn." (*Id.*) As the undisputed evidence shows, Rissanen was traveling at 103 mph on a wet roadway at night with little to no visual cues. Under the actual circumstances of this collision, "a sober and attentive driver would have perceived enough time and distance to complete the left turn." (*Id.* at 13.)

The football field descriptor offered by Dr. Rider is apt because Defendants' toxicologist, Dr. William Meggs, unequivocally agreed that in his professional opinion it would "more likely

---

[7]   Of course, in the sequence of events, Ms. Eichman's *decision* to turn would have preceded her turning the steering wheel, which would have preceded Rissanen's observation of her turning movement. For reference, a speed of 100mph is equivalent to 146.6 feet per second. So even if the time between Ms. Eichman's decision to turn and Rissanen's perception of her vehicle's turn was, for example, only 0.5 seconds, his distance to her would have closed by 73 feet.

than not" be safe for a driver to make a left-hand turn in front of an oncoming vehicle perceived

to be two or three football fields away distance-wise from the turning vehicle and, most critically,

that it in his opinion it would absolutely be a reasonable decision for a sober driver to make. (Ex.

5, Meggs Tr. 70:01 – 71:16.) Accordingly, CCSO's comparative negligence defense cannot

withstand Plaintiff's evidence let alone the opinion of its toxicologist.

       E.      CCSO's Intoxication-Causation Defense Is Merely Speculative Argument

Considering the above evidence, it is perhaps unsurprising that CCSO is unable to explain

*how* Ms. Eichman's alleged intoxication caused or contributed to any negligence on her part, let

alone exceeded that of Rissanen. MAIT's investigation determined that Ms. Eichman's left turning

speed was a reasonable 17 mph.[8] The witness who was driving behind Ms. Eichman in the minutes

and seconds before the collision testified that her vehicle operation was normal and not indicative

of any intoxication:

> A: . . . Ms. Eichman was, in my opinion, driving normally southbound on the road and there was nothing peculiar about her driving that, unfortunately, makes it so – so normal that I don't have a memory. But she certainly was not doing anything out of the normal, because I would probably remember that."
>
> Q: She wasn't, for example, swerving through lanes of traffic, is that right?
>
> A: Correct, yes. The Sedan looked like it was being normally operated at normal speeds in the correct lane, was not under any sort of  -- it did not observe to me that they were impaired in any way."

(Ex. 4, Spodar Tr. 53:18 – 54:5.)

Indeed, even assuming Ms. Eichman was intoxicated while driving as CCSO alleges, Dr.

Rider concluded based on the published gap acceptance data that "[t]o the extent that intoxication

---

[8] Defendants' accident reconstruction expert, Bryan Miller, opined that Ms. Eichman's vehicle was travelling slower—at 12 mph as it crossed Folly Road during the left-hand turn. (Ex. 6, Miller Tr. 133:22 – 134:01.)

was a factor in this collision, a sober and attentive driver would have perceived enough time and distance to complete the left turn." (*see* ECF No. 86, Ex. 18, Rider report at 13.). In other words, CCSO cannot meet its burden on summary judgment to establish the absence of any genuine dispute of material fact on the question of whether Ms. Eichman's alleged negligence exceeded that of Defendant Rissanen in causing the collision.

Rather, there is overwhelming evidence that Rissanen's excessive speed was the causal factor in the collision. MAIT's investigation concluded that had Rissanen been driving the speed limit, "the collision would not have occurred."

> Had Unit #1 been traveling at the posted speed limit, it would have taken 1.65 seconds to travel the same 109.15 feet prior to impact. Given the additional 0.57 seconds (1.65 – 1.08), Unit #2 would have traveled an additional 14.20 feet. Unit #2 was moved 14.20 additional feet along its presumed path of travel on CAD. At this point, the collision would not have occurred but the vehicles are separated by 0.84 feet (10 inches).

(*see* ECF No. 86, Ex. 1, MAIT report at 13.) In other words, the MAIT team concluded that Rissanen's high speed driving was a but-for cause of the collision. Defendants' law enforcement expert, Dean Esserman, also concluded that Rissanen's speed "contributed" to the collision. (Ex. 2, Esserman Tr. 182:19 – 183:07 ("His speed contributed to it. . . . I think speed was a factor. . . . Contributing factor."). Defendant's accident reconstructionist, Bryan Miller, conceded that if Rissanen's emergency lights were not activated and his siren was not turned on, "[h]e would have been charged by MAIT for reckless homicide." (Ex. 5, Miller Tr. 159:17-25.)

As discussed *supra* and in Plaintiff's opposition to Defendant Rissanen's motion for summary judgment, Rissanen's violation of generally accepted law enforcement standards, such as failing to drive with blue lights and siren activated and self-dispatching himself from his off-duty job to respond to an on-duty call without informing anyone, including the on-duty patrol supervisor, are further evidence of his negligence.

20

As Assistant Sheriff Mitch Lucas stated in his deposition, deputies are to drive with due regard for the safety of the public at all times—even when there is a perceived emergency affecting the life of a law enforcement officer: "[T]he number one concern when you start driving above the speed limit or trying to make your way through traffic, that you have to consider the safety of everyone else on the road, or beside the road for that matter. . . . [T]he safety of the public is always paramount." (*see* ECF No. 86, Ex. 7, Lucas Tr.  140:25 – 142:6.)  And he stressed, "the safety of the public is more important than the safety of the deputy."  (*Id.* 222:6-7.)

F.        CCSO Cites Incorrect Negligence Standard for Liability

Finally, CCSO's comparative negligence argument fails because it is premised on the fallacy that it cannot be found liable under the South Carolina Tort Claims Act "unless the responsibility or duty was exercised in a grossly negligent manner." (ECF No. 84 at 8.)  Yet the Tort Claims Act plainly states that "a governmental entity [is] liable for [its] torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained herein." S.C. Code Ann. § 15–78–40 (2005).  The heightened gross negligence standard of liability in the Tort Claims Act applies only in limited circumstances, such as those involving licensing powers or functions (*see* S.C. Code Ann. § 15-78-60(12)); supervision, protection, control, confinement, or custody of students, patients, prisoner, or inmates (*see id.* § 15-78-60(25)); actions of foster care review boards (*see id.* § 15-78-60(30); and actions of the South Carolina Protection and Advocacy System (*see id.* § 15-78-60(31)).  None of those statutory provisions apply to the claims at issue in this case; rather, the liability standard against which CCSO should be held is ordinary negligence.

Yet, even if the gross negligence standard applied, CCSO could still be found liable at trial under the evidence detailed above. The South Carolina Supreme Court has defined gross negligence as "the failure to exercise slight care" as well as "the intentional conscious failure to do something which it is incumbent upon one to do" and "is a relative term, and means the absence of care that is necessary under the circumstances." *See Hollins v. Richland Cty. Sch. Dist. One*, 427 S.E.2d 654, 656 (S.C. 1993). Here, there is ample evidence of gross negligence involving high-speed and/or reckless driving by CCSO and ample evidence of CCSO's notice of the problem. CCSO has long had notice that its deputies lack high-speed driver training, has notice of the exponential risk of fatalities as the vehicle speed increase, and recognizes there is no legitimate reason for deputies to be driving over 100mph. All the same, it condones such reckless driving among its deputies, with tragic consequences for the public. Despite its actual notice of the risks of speeding while driving and of the exponential risk of fatalities that comes with excessive speeds, CCSO deputies continue to cause a shocking number of serious injuries and deaths of innocent motorists in Charleston County, including those outlined *supra* at pp. 6-7.

Capt. Scott Eubanks, the head of CCSO's Office of Professional Standards, testified that he believed there have been six civilians killed in collisions with deputies since Ms. Eichman's death. (Ex. 6, Eubanks Personal Capacity Depo. Tr. 138:15 - 139:25.) CCSO's designee likewise testified at the Rule 30(b)(6) deposition that "since 2014, speeds have been a factor in 13 deputy-involved crashes." (Ex.1, CCSO Rule 30(b)(6) Tr. 149:22-151:11.) This abhorrent track record of serious and fatal collisions occurring before and after Ms. Eichman's death demonstrates CCSO's notice of the dangerous condition created by its deputies' high speed emergency driving and the foreseeable risk of causing serious injury or death to civilians. *See, e.g.*, *Whitt v. City of St. Louis*, No. 4:18-CV-1294 RLW, 2020 WL 7122615, at *9 (E.D. Mo. Dec. 4, 2020) (collecting

22

cases holding that post-incident evidence is relevant to the *existence* of a custom or policy) ("The Court finds the clear majority of case law, as set forth above, supports the conclusion that subsequent incidents may be probative of what policies, practices, or accepted customs existed at the time of Plaintiff's arrest, which would be relevant to his *Monell* claims. From this post-incident evidence the jury may imply the existence of a pre-incident policy, and the evidence may also infer knowledge and moving force.") These deaths under entirely preventable circumstances demonstrate CCSO's indifference to the consequences of its failure to properly train deputies on how to safely operate their police vehicles at high speeds or, alternatively, its failure to limit the circumstances and speeds at which deputies can engage in high-speed driving.

Finally, even Defendant Rissanen agrees that the evidence in this case is sufficient to satisfy the gross negligence standard. (*See* ECF No. 83 at 24 ("The facts, taken in the light most favorable to the Plaintiff, at most, support a claim of negligent or grossly negligent emergency operation of a motor vehicle on the part of Defendant Rissanen as he was responding to an emergency situation of what he believed to be a fellow deputy in distress.").

## III.    Plaintiff's Evidence Establishes Negligent Hiring, Training, and Supervision

Plaintiff brought negligent hiring, supervision, and training causes of action against Defendant CCSO alleging it had knowledge of Defendant Rissanen's prior history of crashing a law enforcement vehicle when responding Code 3 and due to its failure to provide adequate training and supervision of him on high-speed police vehicle driving and safety.

An employer can be independently liable in tort for its own negligent acts. *James v. Kelly Trucking Co.,* 377 S.C. 628, 632, 661 S.E.2d 329, 330 (2008). In circumstances where an employer knew or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer was itself negligent in hiring, supervising, or training the employee, or that the employer acted negligently in entrusting its employee with a tool

23

that created an unreasonable risk of harm to the public." *Id*. In addition, an employer can be held liable when under a duty to exercise reasonable care to control an employee acting outside the scope of his employment. *Degenhart v. Knights of Columbus*, 309 S.C. 114, 116-17, 420 S.E.2d 495, 496-97 (1992). An employer may be liable for negligent supervision even when an employee intentionally harms another when he: "(i) is upon the premises in possession of the employer or upon which the employee is privileged to enter only as his employee, or (ii) is using a chattel of the employer and the employer knows or has reason to know that he has the ability to control his employee and know or should know of necessity and opportunity for exercising such control." *Id*. The *Degenhart* court also recognized that "[a]n employer may have a legal duty arising out of a contract . . . when an employer, by entering into a contract with an employee, places himself in such a relation with the plaintiff that the law imposes upon the employer an obligation, sounding in tort . . . to act in such a way that the plaintiff will not be injured." *Id*.

The negligent hiring of Defendant Rissanen as a road patrol deputy by CCSO is evident from his prior history of crashing his vehicle. In the face of the knowledge that Rissanen previously posed an unreasonable risk of harm to the public when emergency driving, CCSO hired him and entrusted him again with an emergency vehicle without providing him remedial training. Law enforcement expert Roy Taylor testified to the need to provide additional training when hiring a deputy with an infraction history. (*see* ECF No. 86, Ex. 21, Taylor Tr. 189:10-25.) A jury could reasonably find that CCSO was negligent in hiring Rissanen based upon this evidence.

Next, the negligent supervision/training of Rissanen on his emergency driving is evident from the record, including the abject failure of CCSO to provide any of its deputies training on driving police vehicles at high speeds.

Q: What about training offered by the sheriff's office, is there emergency vehicle operations training?

A: We do. Nothing at high speeds.

Q: Why not?

A: Because we don't have the facility for it.

(*see* ECF No. 86, Ex. 7, Lucas Tr. 120:14-20.)

CCSO's refrain is to point to the basic vehicle training that cadets receive at the South Carolina Criminal Justice Academy, but neither Assistant Sheriff Lucas nor CCSO's Rule 30(b)(6) designee could testify as to the highest speeds that students at the Criminal Justice Academy are trained to drive, let alone the training Rissanen received. (*Id.* Tr. 119:25-120:13; *see also* Ex. 1, CCSO Rule 30(b)(6) Tr. 97:6 - 97:17, 100:19-25.)

Plaintiff's expert Roy Taylor explained the significance of this lack of training on high speed emergency vehicle driving: "[I]t really needs to have more training than a firearm does because statistically [deputies] kill more people or injure more people with vehicles than they do with handguns." (*see* ECF No. 86, Ex. 21, Taylor Tr. 189:2-9.) Taylor explained that CCSO had many options to provide such training to deputies in order to reduce traffic fatalities, including utilizing the Federal Law Enforcement Training Center in Glynco, Georgia, which has a high-speed driving course, military installations, or even driving simulators. (*Id.* Tr. 187:02-188:19.) Yet, the only hands-on driver training provided by CCSO to its deputies, which only occurred after Ms. Eichman's death, has a strict speed limit of 45 mph—hardly a sufficient speed to train deputies to operate safely at the actual speeds they drive on Charleston County roads. (*Id.*) CCSO's knowledge of the exponential risk of traffic fatalities that comes with high speeds, and its question to deputies: "IS THERE A TRUE NEED FOR YOUR RESPONDING SPEED TO BE 100mph???" demonstrates its awareness of the problem. (*see* ECF No. 86, Ex. 32 (Charleston

County Emergency Driving Training Materials)). Yet its unwillingness to solve the problem is evidence of its negligence.[9]

## IV.      Plaintiff's Evidence Establishes A Survival Claim

A survival claim must be submitted to the jury "[i]f there is any evidence from which a jury could reasonably conclude a decedent experienced conscious pain and suffering." *Vereen v. Liberty Life Ins. Co.,* 306 S.C. 423, 432, 412 S.E.2d 425, 431 (Ct. App. 1991). Damages in a survival action include recovery for the deceased's conscious pain and suffering and medical expenses. *See Smalls v. South Carolina Department of Education*, 339 S.C. 208, 216, 528 S.E.2d 682, 686 (Ct. App. 2000). In deciding whether to submit a claim of conscious pain and suffering claim to a jury, all evidence and any inferences reasonably therefrom must be viewed in the light most favorable to the plaintiff. *Vereen*, 306 S.C. at 432; 412 S.E.2d at 431. Under this "any evidence" standard, a plaintiff must provide more than a mere scintilla of evidence, but circumstantial and even "weak" evidence is sufficient. *Id.*

Defendant CCSO argues for dismissal of Plaintiff's survival claim on the purported basis that "decedent was deceased immediately upon the collision occurring." (ECF No. 84 at 12.) In support of this claim, Defendant CCSO cites testimony from Defendant Rissanen (who also faces liability on Plaintiff's survival claim) "affirming that she was deceased at the scene." *Id.* But Rissanen's testimony provides no support for CCSO's position that she was "deceased immediately upon the collision occurring." Rather, Rissanen admitted that he stayed away from

---

[9]     CCSO, again, erroneously suggests that Plaintiff must prove gross negligence to establish his negligent hiring, supervision and/or retention claims. As discussed above, however, that standard does not apply in this case. But even if it did, CCSO's "intentional conscious failure to do something which it is incumbent upon one to do," namely, to train its deputies to safely operate their vehicles at high speeds, establishes its gross negligence. *See Hollins v. Richland Cnty. Sch. Dist. One*, 310 S.C. 486, 490, 427 S.E.2d 654, 656 (1993).

her vehicle and "tried not to get too involved with [it] because we're taught, during any type of major instance, whether it's a shooting or not, if other people are on scene, that we need to avoid that, to not contaminate it for any type of crime scene evidence or anything like that. I remember someone approached me and told me that she was deceased." (ECF No. 84-11.) Thus, Rissanen's hearsay testimony simply establishes that Ms. Eichman died at the scene, not that she did not suffer conscious pain and suffering *prior to her death*. CCSO's citation to the autopsy report's statement of her cause of death is likewise insufficient support for CCSO's claim that she died immediately. Rather, the autopsy report lists in detail the various injuries she suffered during the crash sequence, including: a contusion of her right scalp, fractures of her occipital joint, fractures to nine ribs, and fractures to the radii and ulnae bones in her left and right forearms. (ECF No. 84-3 at 1.).

Plaintiff's burden is to offer evidence from which the jury can infer conscious pain and suffering. *Scott v. Porter*, 340 S.C. 158, 171, 530 S.E.2d 389, 394-95 (Ct. App. 2000) (affirming survival damages award of $600,000 based on circumstantial evidence "from which the jury could have inferred pain and suffering which preceded [the decedent's] coma and death"); *see also Croft v. Hall*, 208 S.C. 187, 195, 37 S.E.2d 537, 540 (1946) ("[O]ur decision is not of the preponderance of the evidence but whether there was any from which the jury could reasonably find conscious pain and suffering."). The litany of broken bones and other injuries Ms. Eichman suffered during the collision sequence is part of that evidence. Additional evidence includes body worn camera footage recorded post-collision which shows fire, police, and EMS personnel working to save Ms. Eichman—including while she remained alive in her car with a pulse—and after she was removed to a stretcher. This video shows she survived for approximately ten minutes after the collision until succumbing to her injuries at the scene. (Ex. 8, CCSO 758 (bodycam footage 24343)). It does not take expert testimony for a jury to conclude that shattering various bones in your body in

a car crash is an unimaginably painful experience accompanied by tremendous suffering and mental anguish. Because this evidence provides a basis for a jury to reasonably infer or conclude that Ms. Eichman suffered conscious pain and suffering prior to her death, this claim must be submitted to the jury. *Vereen*, 306 S.C. at 432, 412 S.E.2d at 431.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests the Court enter an Order denying Defendant CCSO's motion for summary judgment.

Respectfully submitted,

> **McLEOD LAW GROUP, LLC**
> Post Office Box 21624
> Charleston, South Carolina 29413
> (843) 277-6655
>
> *s/ Colin V. Ram*
> Colin V. Ram, No. 12958
> W. Mullins McLeod, Jr., No. 7142
> colin@mcleod-lawgroup.com
>
> *and*
>
> **STAVRINAKIS LAW FIRM**
>
> Leon Stavrinakis
> One Cool Blow Street, Suite 201
> Charleston, SC 29403
>
> *Attorneys for Plaintiff*

April 28, 2023
Charleston, South Carolina