IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Neil Eichman, as Personal Representative of the Estate of Megan R. Eichman, | )<br>)<br>)<br>) |
| Plaintiff, | ) Civil Action No. 2:20-cv-4057-BHH |
| v. | )<br>) |
|  | ) **ORDER** |
| Austin Rissanen, in his individual capacity; Charleston County Sheriff's Office; and Town of James Island, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |
| _____ | ) |

This matter is before the Court on the motions for summary judgment filed by Defendants Austin Rissanen ("Rissanen"), in his individual capacity (ECF No. 83); Charleston County Sheriff's Office ("CCSO") (ECF No. 84); and Town of James Island ("he Town") (ECF No. 85). The Court held a hearing on the motions on July 20, 2023.

Now, having thoroughly reviewed the evidence of record in the light most favorable to Plaintiff, and having considered the parties' arguments and the applicable law, the Court finds, for the reasons stated on the record during the hearing and for the reasons set forth herein, that Defendants are entitled to summary judgment on Plaintiff's § 1983 claims. Thus, the Court grants in part Defendants' motions for summary judgment, and the Court remands Plaintiff's remaining state law claims to state court for further disposition.

**BACKGROUND**

This action arises out of a motor vehicle collision that occurred at around 9:48 p.m. on November 18, 2018, on Folly Road on James Island, South Carolina, and which resulted

in the death of Megan R. Eichman.  At the time of the collision, Defendant Rissanen, a deputy with the CCSO, was driving an unmarked Chevy Tahoe owned by CCSO.  Rissanen was in uniform and was patrolling the Town of James Island as a member of the Town's "Island Sheriff's Patrol" pursuant to an agreement between CCSO and the Town, and Rissanen was accompanied by a volunteer state constable, William Kitchener ("Kitchener"), who was participating in a ride-along.

At the time of the collision, Megan Eichman was driving her Nissan Altima southbound on Folly Road, when she slowed down and entered the middle turn lane and began to make a lefthand turn across the oncoming lanes.[1]  Rissanen was traveling northbound on Folly Road when the two vehicles collided, and data from Rissanen's Tahoe indicates that he was traveling approximately 103 miles per hour in the seconds before the collision, in a section of the road where the speed limit is 40 miles per hour.  The parties dispute, among other things, whether Rissanen was responding to an emergency at the time of the collision and whether his emergency lights and sirens were activated.

Prior to the collision, Rissanen and Kitchener had been stopped on Folly Road, along with Deputy James Carter ("Carter"), "talking to each other" and "watching traffic." (ECF No. 83-3 at 5-6.)  Deputy Carter then left to make a traffic stop of another vehicle, following which Rissanen and Kitchener went across the street to a Blue Water gas station, which was approximately one mile south of the collision site, to investigate an unattended vehicle that had loud music playing.  Rissanen activated his body camera while he sat in his Tahoe waiting for the other vehicle's owner or occupant to return.  Although Plaintiff

---

[1] At the time of the collision, Megan Eichman was operating her vehicle without a legal driver's license and with a blood alcohol content of 0.229%.

disputes whether Rissanen was responding to an emergency at the time of the collision, at approximately the two-minute mark of the body camera footage provided to the Court, dispatch can be heard putting the radio in emergency mode, and then a few seconds after the emergency tone, dispatch can be heard asking for all units in proximity to respond to the Post Office on Folly Road by Ellis Oaks, which was about two and a half miles away from Rissanen's location at the gas station.  Also according to the body camera footage, Rissanen's vehicle begins moving immediately following the emergency tone, and reflections of blue lights can be seen and a siren can be heard, although Rissanen subsequently turned off his body camera at some point after he began traveling north on Folly Road.  (*See* ECF No. 83-9.)

According to Rissanen's testimony, immediately before dispatch put the radio in emergency mode, he heard "Deputy Carter in distress."  (ECF No. 83-2 at 12.)  Rissanen asserts that he heard Carter "scream out his badge number" but that "his transmission got cut off, and then the dispatcher tried to check on him and he wouldn't answer."  (*Id.* at 13-14.)

Also, according to Kitchener's testimony, Deputy Carter "had just left us to do that traffic stop on that car," and he and Rissanen were going to check out the vehicle with music playing "about the time that Hank Carter came across the radio yelling his call sign." (ECF No. 83-3 at 7.)  Kitchener testified: "And we just did a U-turn in the parking lot and left when we heard him over the radio.  And at that point in time, there was – the dispatcher was trying to raise him back, and he did not answer.  And then at some point, she put the radio in marker – channel marker, emergency."  (*Id.* at 8-9.)

According to the Charleston County Computer Aided Dispatch ("CAD") report,

Deputy Carter informed dispatch of his traffic stop at Folly Road and Ellis Oak Road at 9:41:11 p.m. (ECF No. 86-5.) The corresponding audio indicates that Deputy Carter advised dispatch that he pulled into the Post Office at 9:43:07 and radioed his unit number to dispatch. (ECF No. 86-6.) When Carter did not respond, dispatch put out a channel marker tone to limit the channel to emergency calls only and asked for available units to respond to Carter's location at the Post Office. (ECF No. 86-5 at 3.) At 9:46:22 p.m., Unit 224, informed dispatch that he was responding "code 3," and at 9:46:40, another deputy advised dispatch that she was also "going down Central Park right now," and the CAD report indicates that Units 224 and 248 were dispatched to back up Deputy Carter. (*See* ECF No. 86-5 and 86-6.) Rissanen did not advise dispatch that he was responding to Carter's location. The collision between Rissanen's and Eichman's vehicles occurred at around 9:48 p.m. and before Carter responded to dispatch.

Plaintiff filed this action on October 26, 2020, in the Charleston County Court of Common Pleas, alleging the following causes of action: (1) negligence against all Defendants; (2) negligent hiring, supervision, and/or retention against CCSO and the Town; (3) violation of Megan Eichman's Fourteenth Amendment rights by Defendant Rissenen, pursuant to 42 U.S.C. § 1983; (4) municipal liability against CCSO and the Town for violating Megan Eichman's Constitutional rights, pursuant to 42 U.S.C. § 1983; (5) survival action against all Defendants; and (6) wrongful death against all Defendants. (ECF No. 1-1.) Defendants removed the action to this Court on November 20, 2020, based on the Court's federal question jurisdiction.

**STANDARD OF REVIEW**

A court shall grant summary judgment if a party shows that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In considering a motion for summary judgment, all evidence should be viewed in the light most favorable to the non-moving party. *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

**DISCUSSION**

As an initial matter, the Court notes that, in response to the Town's motion for summary judgment, Plaintiff consented to the dismissal of the § 1983 claim against the Town. (*See* ECF No. 88 at 9 ("Plaintiff recognizes there is no genuine issue of material fact regarding a custom, policy or practice by the Town to support his § 1983 *Monell* claim against it. For this reason, Plaintiff consents to dismissal of his § 1983 claim against Town of James Island only.").) Indeed, as the Court indicated at the hearing, no genuine issues of material fact exist regarding a custom, policy, or practice on the part of the Town that would be sufficient to support liability against the Town. Accordingly, the Court grants summary judgment in favor of the Town as to Plaintiff's § 1983 claim against it.

Next, as the Court also indicated at the hearing, the Court also finds that CCSO is entitled to summary judgment on Plaintiff's § 1983 claim against it. Stated briefly, a

Sheriff's Office in South Carolina is considered an arm of the state, and not a "person" within the meaning of § 1983, and the Court finds that CCSO is entitled to Eleventh Amendment immunity. *Gulledge v. Smart*, 691 F. Supp. 947, 954-55 (D.S.C. 1988); *see, e.g., Collins v. Aiken Cty. Det. Ctr.*, No. 8:18-CV-2744-MGL-JDA, 2018 WL 6288115, at *2 (D.S.C. Oct. 24, 2018) (noting that a Sheriff's office is entitled to Eleventh Amendment immunity), *report & recommendation adopted*, No. CV 18-2744-MGL, 2018 WL 6267756 (D.S.C. Nov. 30, 2018); *Muhammad-Ali v. Klans*, No. CV1:15-308-MGL-SVH, 2015 WL 11109836, at *3 (D.S.C. Aug. 13, 2015) (finding that the Aiken County Sheriff's Department is entitled to Eleventh Amendment immunity because Sheriff's departments in South Carolina have repeatedly been held to be exempt from § 1983 liability, as they are considered state agencies.), *report & recommendation adopted sub nom. Muhammad-Ali v. Ku Klux Klan*, No. CV 1:15-308-MGL, 2015 WL 11108438 (D.S.C. Sept. 22, 2015).

Furthermore, the Court is not convinced by Plaintiff's argument that CCSO effectively waived its Eleventh Amendment immunity as to Plaintiff's § 1983 claim against it by removing the case to federal court, as such argument is contrary to binding Fourth Circuit precedent. *See Passaro v. Virginia*, 935 F.3d 243, 248 (4th Cir. 2019) (rejecting the argument that the Commonwealth of Virginia waived its sovereign immunity to a Title I claim by removing the case to federal court); *Stewart v. North Carolina*, 393 F.3d 485 (4th Cir. 2005) (holding that where a state retains its sovereign immunity from suit in state court, it does not lose that immunity by removing the case to federal court); *see also Washington v. South Carolina Department of Corrections*, No. 6:19-cv-0098-RMG, 2020 WL 5948322, n. 5 (D.S.C. May 5, 2020) (noting that voluntarily removing a case to federal court does not waive a defendant's immunity to § 1983 claims); S.C. Code Ann. § 15- 78-20(e) ("Nothing

in this chapter is construed as a waiver of the state's . . . immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States . . . ."). Accordingly, the Court grants summary judgment in favor of Defendant CCSO with respect to Plaintiff's § 1983 claim against it.

Next, the Court turns to Plaintiff's § 1983 claim against Defendant Rissanen, which is based on the alleged violation of Megan Eichman's Fourteenth Amendment substantive due process rights. As the Court explained at the hearing, the parties agree that "shocks the conscience" is the appropriate standard that applies to Plaintiff's § 1983 claim against Rissanen; however, the parties do not agree as to what standard of culpability is required for Rissanen's conduct to be considered "conscience shocking."

Indeed, to prove a violation of substantive due process rights under the Fourteenth Amendment, Plaintiff must show that Rissanen's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Terrell v. Larson*, 396 F.3d 975, 978 (8th Cir. 2005)), *cert. denied*, — U.S. —, 141 S.Ct. 2800 (2021) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n.5 (1998)); *see also Dean ex rel. Harkness v. MicKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (quoting the same). In *Lewis*, the Supreme Court examined whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate indifference or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender.[2] 523 U.S. at 836. In answering no, the Court held

---

[2] In *Lewis*, the defendant officer, while driving his patrol car, pursued a speeding motorcycle through a neighborhood for 75 seconds at speeds up to 100 miles per hour, covering a distance of 1.3 miles. 523 U.S. at 837. The chase ended when the motorcyclist fell over while turning and the patrol car struck him, killing him. *Id.*

that "*only a purpose to cause harm unrelated to the legitimate object of arrest* will satisfy the element of arbitrary conduct shocking to the conscience." *Id*. (emphasis added). Importantly, the Court also explained "that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward to it, only at the ends of the tort law's spectrum of culpability." *Id.* at 848. In other words, the Court described a "culpability spectrum," explaining that on one end of the spectrum is "negligently inflicted harm," which is "categorically beneath the threshold of constitutional due process."[3] *Id.* On the other end of the spectrum, however, is "conduct intended to injure in some way unjustifiable by any government interest," and which would "most probably support a substantive due process claim." *Id.* According to the Court, "it is a matter for closer calls" when conduct falls within the middle range of culpability, i.e., when conduct is more than negligence but less than intentional. And the Court explained that deliberate indifference is an "intermediate level of culpability" that can, if proven, establish a due process violation under certain circumstances. *Id.* at 848-49. Unlike the intent-to-harm standard, however, the Court explained that the deliberate indifference standard "is sensibly employed only when actual deliberation is practical." *Id.* at 851. Thus, whether one has time to reflect on his actions "is a factor in determining whether deliberate indifference is the appropriate standard."

---

[3] As the Court explained in *Lewis*:

> We have accordingly rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.

523 U.S. at 848-49 (citations omitted).

8

*Dean*, 976 F.3d at 415 (citing *Browder v. City of Albequerque*, 787 F.3d 1076, 1082 (10th Cir. 2015)); *Lewis*, 523 U.S. at 853 ("[L]iability for deliberate indifference . . . rests upon the luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations.  When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking.").  "Thus, when an officer is able to make unhurried judgments with time to deliberate, *such as in the case of a non-emergency*, deliberate indifference is the applicable culpability standard for substantive due process claims involving driving decisions."  *Dean*, 976 F.3d at 415 (emphasis added).

"Since *Lewis*, courts have extended application of the intent-to-harm standard, holding that it applies not only 'to an officer's decision to engage in high-speed driving in response to other types of emergencies, [but also] to the manner in which the police car is then driven in proceeding to the scene of the emergency.'" *Dean*, 976 F.3d at 414-15 (quoting *Terrell*, 396 F.3d at 979).  "Thus, under *Lewis*, the intent-to-harm culpability standard applies to officers responding to an emergency call."  *Id.*; *see also Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998) (distinguishing between emergency action and actions taken after opportunity for reflection in assessing the constitutionality of law enforcement actions post-*Lewis,* and explaining that in emergency situations only conduct in which the government official intended to cause harm and in which the state lacks any justifiable interest will shock the conscience and result in constitutional liability).

Here, in his motion for summary judgment, Defendant Rissanen asserts that intent-to-harm is the appropriate standard of culpability that applies to Plaintiff's substantive due process claim because the evidence, viewed in the light most favorable to Plaintiff, shows

9

that Rissanen believed he was responding to an emergency at the time of the collision. Furthermore, Defendant Rissanen contends that he is entitled to qualified immunity because no clearly established interpretation of the law at the time would have indicated to a reasonable officer that the rapid emergency response violated Megan Eichman's Fourteenth Amendment rights.[4]

In contrast, Plaintiff asserts that "deliberate indifference" is the appropriate standard of culpability under the circumstances, relying in part on the Fourth Circuit's 2020 decision in *Dean*.  976 F.3d 407.  According to Plaintiff, *Dean* involves a "remarkably similar fact pattern involving a deputy sheriff who caused a collision while driving 'too fast for conditions.'" (ECF No. 86 at 26 (quoting *Dean*, 976 F.3d at 412-414).)  After careful review, however, the Court finds the circumstances in *Dean* readily distinguishable from the circumstances in this case.

In *Dean*, a motorist sustained severe injuries after colliding with an Anderson County deputy sheriff, Stephen McKinney, who was operating his department-owned Chevy Tahoe at least 38 miles per hour over the posted speed limit of 45 miles per hour.  976 F.3d at 411-12.  The collision occurred at night after McKinney heard another deputy on the radio request assistance.  After considering the evidence of record in the light most favorable to the plaintiff, the court found that deliberate indifference was the appropriate standard of culpability for purposes of summary judgment because "a jury could conclude that

---

[4] Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as the conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  When considering a qualified immunity defense, courts consider whether the government official violated a statutory or constitutional right, and if so, whether that right was clearly established at the time of the alleged conduct." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

McKinney was not responding to an emergency and had time to deliberate his actions." 976 F.3d at 415. In support of its conclusion, the court noted, among other things: (1) after McKinney had activated his blue lights and siren to proceed to the location of the officer who had requested assistance, the officer radioed that there was no emergency, stating that units could "back down on emergency response"; (2) the shift supervisor, who had issued a "code 3" emergency response for available officers to assist, thereafter cancelled the code 3; (3) McKinney then acknowledged the cancellation of the code 3 by stating affirmatively that he was "backing down" to code 1, a non-emergency response; and (4) McKinney continued to drive nearly forty miles per hour over the speed limit and lost control of his vehicle approximately two minutes after the code 3 was cancelled. *Id.* at 412, 415-16. Under these facts, the court stated:

> Thus, McKinney had ample time to consider, based on his training, department policy and state law, the proper response given that the call was no longer an emergency. He deactivated his emergency lights and siren as required for non-emergency responses—indicating that he knew the situation was no longer an emergency—but did not reduce his speed to conform to the speed limit. The evidence therefore supports a finding that there was no emergency, and that McKinney had ample time to deliberate his actions. Accordingly, deliberate indifference is the appropriate standard of culpability at this posture, under the facts and circumstances of this case, to determine whether McKinney violated Harkness's substantive due process rights.

*Id.* at 416.

In contrast to the facts in *Dean*, the evidence in this case, which includes video recordings of certain portions of the events in question,[5] clearly shows that Rissanen was

---

[5] Although courts are required to view the facts and draw reasonable inferences from those facts in the light most favorable to the party opposing summary judgment, where "the record contains an unchallenged videotape capturing the events in question," a court "must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008); *see also Scott v. Harris*, 550 U.S. 372 (2007).

engaged in an emergency response at the time of the collision. While Plaintiff argues that there is a dispute of fact as to "[w]hether Rissanen's response to Deputy Carter's location served a legitimate law enforcement purpose or whether it was the response of an off-duty[6] deputy searching for activity on a slow Sunday evening," (ECF No. 86 at 21), nowhere does Plaintiff point to any evidence to contradict the fact that shortly after hearing Carter speak his badge number on the radio, dispatch put the channel into emergency mode and asked available units in proximity to respond to Carter's location, which was about two and a half miles away from Rissanen's location. After the channel was placed in emergency mode, the video clearly shows Rissanen's vehicle immediately begin to move, with lights and siren activated.[7] Furthermore, contrary to the facts in *Dean*, at no point does dispatch cancel the emergency or otherwise inform officers to back down from an emergency response. In fact, the undisputed evidence indicates that two other officers also self-dispatched to Carter's location in response to the emergency tone, and at least one announced his response as a "code 3" (or emergency) response. (ECF No. 86-6.) The collision occurred at around 9:48 p.m., approximately a minute and a half after the channel was placed in emergency mode and approximately a mile from where Deputy Rissanen began his emergency response, and Carter did not respond to dispatch until after the collision

---

[6] Although Plaintiff asserts that Rissanen was an off-duty deputy, Plaintiff points to no evidence to indicate that Rissanen's response to Carter was anything other than a response in his official duty as a Charleston County Sheriff's deputy while acting in a law enforcement capacity for the Town's "Island Sheriff's Patrol." (*See also* ECF Nos. 83-20, 83-21, 83-23, and 89-7.)

[7] Defendant Rissanen's lights also appear to be activated at the time of collision as seen on a video taken from a security camera at the Stag Erin Pub, adjacent to the collision site. (*See* ECF No. 83-8 at 1:36.)

occurred.[8]

Under the circumstances of this case, the Court agrees with Defendant Rissanen that intent-to-harm is the appropriate "conscience shocking" standard of culpability for Plaintiff's substantive due process claim, as the evidence indicates that Rissanen was engaged in an emergency response and actual deliberation was not practical. *See also Terrell*, 396 F.3d at 979 (holding that the intent-to-harm standard of *Lewis* applies to an officer's decision to engage in high-speed driving in response to other types of emergencies, *and* to the manner in which the police car is then driven in proceeding to the scene of the emergency" (emphasis added)); *Dean*, 976 F.3d at 415 ("Thus, under *Lewis*, the intent-to-harm culpability standard applies to officers responding to an emergency call.").

Ultimately, while the circumstances of this case are undeniably tragic, there is simply no evidence that Rissanen intended to harm Megan Eichman in some way unjustifiable by any governmental interest. Accordingly, regardless of whether any conduct on the part of Rissanen violated the reasonableness upheld by tort law or the balance sought by law enforcement policies and procedures, which are matters for consideration in connection with Plaintiff's state law claims, the Court finds that the fault claimed on Rissanen's part, tested according to the totality of the facts, does not meet the shocks-the-conscience test

---

[8] Plaintiff also points to *Browder* in support of the argument that deliberate indifference is the appropriate standard of culpability to apply in this case. 787 F.3d 1076 In *Browder*, upon which the Fourth Circuit relied in *Dean*, the Tenth Circuit evaluated whether an officer who had finished his shift but nevertheless proceeded to drive home with his emergency lights on at an average of 66 miles per hour, running a red light and killing someone, was entitled to qualified immunity in a § 1983 suit. The court answered no, noting that the officer "used his official squad car and activated its emergency lights and proceeded to speed through surface city streets at more than 60 miles per hour over 8.8 miles through eleven city intersections and at least one red light–all for his personal pleasure, on no governmental business of any kind." 787 F.3d at 1080. For obvious reasons, the Court finds the facts of *Browder* readily distinguishable from the facts of this case.

or rise to the level of a violation of a constitutional right that was clearly established at the time of the collision.  Furthermore, there being no constitutional violation, the Court also finds that Rissanen is entitled to qualified immunity.  For the foregoing reasons, therefore, the Court grants summary judgment in favor of Defendant Rissanen with respect to Plaintiff's § 1983 claim.

Having found that summary judgment is appropriate as to all Defendants on Plaintiff's federal claims filed pursuant to § 1983, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and instead remands those claims to state court.

## **CONCLUSION**

Based on the foregoing, it is hereby **ORDERED** that Defendants' motions for summary judgment (ECF Nos. 83, 84, and 85) are granted in part, specifically as to Plaintiff's § 1983 claims, and Plaintiff's remaining state law claims are remanded to state court for further disposition.

**IT IS SO ORDERED.**

/s/Bruce H. Hendricks
United States District Judge

December 8, 2023
Charleston, South Carolina